CUDAHY, Circuit Judge.
 

 On November 13, 1991, a jury convicted Alex J. Salava of possessing a firearm after having been convicted of a felony in violation of 18 U.S.C. § 922(g)(1). Under the enhanced punishment provision of 18 U.S.C. § 924(e)(1), Salava was sentenced to 262 months imprisonment. Salava appeals
 
 *321
 
 both his conviction and his sentence on several grounds. We reverse.
 

 I.
 

 On the evening of March 3,1991, Michael Heath called the Pierce County Sheriffs Department (Pierce County) and told them that he had given a ride to a person who was covered with blood and who said he had killed someone. Heath also reported that this individual was in possession of a sawed-off shotgun. Heath told the Pierce County authorities that he had dropped this person off at a trailer park in Roberts, Wisconsin (the Roberts trailer park).
 

 At approximately 6:30 p.m., Pierce County relayed this information to Captain Max Ihrke, the Chief Deputy Sheriff for St. Croix County, Wisconsin, in which Roberts is located. Ihrke immediately drove to the Roberts trailer park, arriving at approximately 6:45 p.m. Three or four deputy sheriffs and two officers from the Roberts Police Department were already on the scene. Shortly after Ihrke’s arrival, the officers learned from the manager of the trailer park that the trailer at which Heath had dropped off his passenger was leased to Alex Salava, whom Ihrke knew from Salava’s prior felony convictions.
 

 The officers then prepared to enter Sala-va’s trailer in order to look for- a dead or injured person. As it later turned out, Salava had not in fact shot anyone, but instead had fought with an imaginary opponent, wounding himself in the process. At the time, however, the police did not know this. Therefore, they took a number of steps in preparation for entering Salava’s trailer, which they considered to be a high-risk operation. Ihrke directed the evacuation of the trailers surrounding Salava’s. He contacted Pierce County authorities and asked them to bring to the trailer court their canine unit, tear gas and the witnesses who had provided the initial tip. He also sent officers to look for Salava at a residence near the trailer park where Salava apparently had been earlier in the afternoon and in the taverns and other public places in the area.
 

 At approximately 8 p.m., just as the officers were ready to enter the trailer, a car pulled into the driveway. Salava jumped out on the passenger side of the car and tried to run around the end of the trailer, where he was apprehended by police officers. The driver of the car, Christine Yas-faret, was arrested while still in the car. Using Salava’s keys, the officers then entered the trailer in order to search for an injured person.
 

 The first, officer to enter the trailer, Deputy Sheriff David Niederer, made a quick scan with his flashlight and immediately saw the barrel of a shotgun on the couch, pointing toward the door. Ihrke, who stood outside the door while the officers searched the trailer, could also see the muzzle of what he believed to be a shotgun on the couch. Niederer picked up the gun to secure it while the other officers searched the trailer, but returned it to the couch once the search was completed, approximately one minute later.
 

 Ihrke then secured the trailer and left to contact the district attorney in order to get a search warrant. In the meantime, Earl Clark, an investigator with the St. Croix Sheriff’s Department, obtained a consent to search from Yasfaret, who was a co-lessee of the trailer. Clark and Vasfaret drove to the trailer court, followed by other law enforcement officers in another car. Vas-faret led the officers into the trailer, where Clark immediately saw the barrel of a shotgun sticking out from under two pillows on the couch. Clark seized the shotgun along with two shells, one live and one spent.
 

 On May 8, 1991, a federal grand jury returned a one-count indictment against Sa-lava charging him with, possessing a firearm after having been convicted of a felony in violation of 18 U.S.C. § 922(g)(1). Sala-va pleaded not guilty and moved to dismiss the indictment on the ground that the authorities (specifically, Clark) had intentionally destroyed exculpatory evidence by wiping any fingerprints off the shotgun. Sala-va also filed a motion to suppress the evidence seized during the search of his trailer on the ground that the search had violated his rights under the Fourth and Fourteenth
 
 *322
 
 Amendments. The district court denied both these motions on August 21, 1991. On the date of the final pretrial conference Salava filed another motion to dismiss the indictment, arguing that his federal prosecution violated the Fifth Amendment’s prohibition against double jeopardy because he had already been prosecuted in state court for the same conduct. The district court also denied that motion.
 

 In addition to his various motions, Salava filed notice of his intent to rely on an insanity defense. The court appointed Dr. Albert Lorenz, a psychiatric expert, to assist in that defense. On November 8, 1991, the government filed a motion
 
 in limine
 
 seeking to preclude Salava from introducing the testimony of Dr. Lorenz in support of his insanity defense. The government also sought to exclude the testimony of another psychiatrist, Dr. Ronald Diamond, who had treated Salava while he was in prison awaiting trial. After reviewing the proffered report of Dr. Lorenz and hearing the voir dire of Diamond, the district court granted the government’s motion and excluded the testimony of both witnesses. Salava presented no defense at trial. He was found guilty on November 13, 1991, and sentenced to 262 months imprisonment. Salava appeals the district court’s rulings on his various motions and the exclusion of the testimony of Drs. Lorenz and Diamond. He also challenges his sentence as a violation of the Eighth Amendment’s prohibition on cruel and unusual punishment.
 

 II.
 

 Under, federal law, a defendant’s mental disorder constitutes an affirmative defense to prosecution if “(1) it is ‘severe’ and (2) as a result of it the defendant was unable at the time of the crime ‘to appreciate the nature and quality or the wrongfulness of his acts.’ ”
 
 United States v. West,
 
 962 F.2d 1243, 1245 (7th Cir.1992) (quoting 18 U.S.C. § 17(a) (1988)). The district court granted the government’s motion to exclude Dr. Lorenz’s testimony because it concluded, based on Dr. Lorenz’s report, that his testimony would' not “allow a jury to ... draw a reasonable inference that the defendant was unable to appreciate the nature and quality of or wrongfulness of his acts as a result of a severe mental disease.” Tr.Vol 2 at 38. As the court explained:
 

 I certainly accept Dr. Lorenz’s statements that the defendant has a severe disorder and that he is or it is something to be dealt with very seriously. But I cannot find anything that will make the second prong , of the argument, which is that he was unable to appreciate the nature and quality of or wrongfulness of his acts. And that I think is crucial, and without that it’s not evidence that would be useful to the Jury or helpful to them in making its [sic] decision.
 

 Id.
 
 Salava argued strenuously that Dr. Lorenz’s testimony need not establish that Salava could not appreciate the wrongfulness of his acts in order to be admissible. Indeed, Salava noted that Federal Rule of Evidence 704(b) explicitly prohibits a psychiatric expert from testifying on that point. Therefore, he contended, Dr. Lorenz’s testimony should be admitted because it “establishes] the severity of [Salava’s] mental disorder. The fact that Dr. Lorenz might not establish the other prong of the defense by his testimony aloné is not a good enough reason to keep it out.” Tr. Yol. 2 at 21. Salava renews this argument on appeal. Given our recent decision in
 
 West,
 
 we- must agree.
 

 In
 
 West,
 
 the defendant, Peter West, sought to introduce the testimony of a court-appointed psychiatrist, Dr. Lawrence L. Jeckel, in support of his insanity defense to charges of bank robbery. In. response to questioning on voir dire, Dr. Jeckel stated that West “suffer[ed] from a severe mental disease or defect, specifically a schi-zoaffective disorder,” and that he “was suffering from that disorder on the day he robbed the bank.” 962 F.2d at 1245. Dr. Jeckel also stated, however, that in spite of his mental condition West “knew he was robbing a bank and understood that robbing banks is wrong.”
 
 Id.
 
 The district court granted the government’s motion to exclude Dr. Jeckel’s testimony based on Dr. Jeckel’s opinion that West understood the nature and quality of his acts. As the
 
 *323
 
 court put it: “[I]t is outrageous to say that a psychiatrist whose opinion is that the defendant knew what he did was wrong and knew what he was doing should testify in support of an insanity defense when the physician says that under the definition of the statute ... there is no insanity____”
 
 Id.
 

 We reversed, holding that Dr. Jeckel’s testimony was admissible to prove that the defendant suffered from a severe mental disease — the first element of the insanity defense — despite the fact that his opinion tended strongly to disprove the second element.
 
 Id.
 
 at 1248. We think it clear that, if a psychiatrist’s testimony that a defendant has a severe mental disease cannot be excluded on the basis that his opinion as to the second prong of the defense tends to
 
 disprove
 
 the defense, then,
 
 a fortiori,
 
 that same testimony cannot be excluded simply because the psychiatrist’s opinion
 
 fails to prove
 
 the second prong. In either case, the expert’s opinion as to whether the defendant’s severe mental disease resulted in an inability to understand the nature and quality of his acts is “legally insignificant."
 
 Id.
 
 at 1247. The district court abused its discretion in excluding the testimony of Drs. Lorenz and Diamond on this basis.
 
 [1]
 

 The government argues, however, that Dr. Lorenz’s testimony was not admissible even to show that Salava suffered from a “severe mental disease” because the mental condition to which Dr. Lorenz would have testified does not qualify as “severe” under the statute. The government relies on the legislative history of 18 U.S.C. § 17, which states: “The concept of severity was added to emphasize that non-psychotic behavior disorders or neuroses such as an ‘inadequate personality,’ ‘immature personality,’ or a pattern of 'antisocial tendencies’ do not constitute the defense.” S.Rep. No. 98-225, 98th Cong., 2d Sess. 229 (1984),
 
 reprinted in
 
 1984 U.S.C.C.A.N. 3182, 3411. The government argues that because Dr. Lorenz would have testified that Salava was not psychotic but suffered from antisocial personality disorder, his testimony was not relevant to either prong of the insanity defense under the statute. As the Assistant U.S. Attorney put it during his argument to the district court: “calling a duck a dog doesn’t make it a dog.” Tr.Vol. 2 at 18.
 

 As a general matter, the government’s point is well-taken. It seems clear that Congress intended by its inclusion of the modifier “severe” to place certain “disorders” outside the purview of the insanity defense altogether. But we cannot accept the government’s contention that this is such a case on the record before us. The government made the same argument to the district court, which nonetheless “accept[ed] Dr. Lorenz’s statements that the defendant has a severe disorder.” Further, it is not clear from Dr. Lorenz’s report that Salava’s mental disorders do not qualify as “severe” under the statute. For instance, although Dr. Lorenz’s report states that Salava’s primary diagnosis is “antisocial personality disorder,” he also notes that Salava’s reactions to his surroundings are often “unrealistic” and “paranoid” and that he- suffers from “paranoid personality disorder.” Report of A.A. Lorenz, M.D., at 3-4 (Nov. 5, 1991). In addition, Dr. Lorenz’s report notes that Salava “may indeed manifest psychotic appearing behavior as his legal situation worsens.”
 
 Id.
 
 at 4. The legislative history of section 17 does not use the term “paranoid” at all. Nor is the relationship between “psychotic appearing behavior” and Salava’s diagnosis apparent from the face of Dr. Lorenz’s report. As an appellate court, we are in no position to determine whether the characteristics described by Dr. Lorenz are symptoms of the sort of “nonpsychotic behavior disorder” Congress intended to exclude from the insanity defense or of some other type of mental illness that the statute
 
 *324
 
 would recognize. This sort of conclusion can only be drawn by a district court in light of expert testimony explaining these psychiatric terms; this question will presumably be before the district court in the event of a retrial.
 

 III.
 

 Although our conclusion that the district court erred in excluding the testimony of Drs. Lorenz and Diamond results in a reversal of Salava’s conviction, it does not preclude a retrial. Therefore, the other claims of error alleged by Salava are still live. However, we address in detail only his argument that the district court should have granted his motion to suppress the shotgun on the ground that the initial search of his trailer violated the Fourth and Fourteenth Amendments. We affirm without discussion the district court’s rulings on Salava’s other claims.
 

 It is well settled that “searches conducted outside the judicial process, without prior approval by judge or magistrate, are
 
 per se
 
 unreasonable under the Fourth Amendment — subject only to a few specifically established and well-delineated exceptions.”
 
 Mincey v. Arizona,
 
 437 U.S. 385, 390, 98 S.Ct. 2408, 2412, 57 L.Ed.2d 290 (1978) (quoting
 
 Katz v. United States,
 
 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967));
 
 see also California v. Acevedo,
 
 — U.S. —, —, 111 S.Ct. 1982, 1991, 114 L.Ed.2d 619 (1991) (reaffirming this principle and quoting above passage from
 
 Mincey).
 
 In upholding the warrant-less search of Salava’s trailer,
 
 [2]
 
 the district court relied on the so-called “exigent circumstances” exception to the warrant requirement. The exigent circumstances doctrine provides that a “warrantless entry by criminal law enforcement officials may be legal when there is a compelling need for official action and no time to secure a warrant.”
 
 Michigan v. Tyler,
 
 436 U.S. 499, 509, 98 S.Ct. 1942, 1949, 56 L.Ed.2d 486 (1978). Thus, as the Supreme Court recognized in
 
 Mincey,
 

 the Fourth Amendment does not bar police officers from making warrantless entries and searches when they reasonably believe a person within is in need of immediate aid. Similarly, when the police come upon the scene of a homicide they may make a prompt warrantless search of the area to see if there are other victims or if a killer is still on the premises.
 

 Mincey,
 
 437 U.S. at 392-93, 98 S.Ct. at 2413. The district court found that, under
 
 Mincey,
 
 the entry in this case was justified by exigent circumstances, and denied Sala-va’s motion to suppress. We must affirm that decision unless it was “clearly erroneous.”
 
 United States v. Bennett,
 
 908 F.2d 189, 192 (7th Cir.1990).
 

 We agree with the district court that exigent circumstances existed in this case. The police had reliable information that Salava claimed to have killed someone, that he had been seen covered with blood and in possession of a sawed-off shotgun and that his last known location was at his trailer. The officers reasonably feared that either an armed and dangerous man, or a wounded victim, or both were inside the trailer. The situation thus falls squarely within the exigent circumstances described in
 
 Mincey.
 

 Further, we agree with the district court that the exigency did not evaporate simply because the police deferred their entry while they took reasonable precautions to reduce the risk of serious injury to themselves or others:
 

 When the police have a reasonable suspicion that someone is injured or that the public safety is in jeopardy, but refrain from taking immediate action in an effort to confirm or deny the suspicion, and then act once they have received no indication that the danger has been dissipated, the waiting period does not defeat the applicable exception to the warrant rule.
 

 United States v. Jones,
 
 635 F.2d 1357, 1362 (8th Cir.1980). Although at the time the police actually entered the trailer they knew that Salava was not inside, the exigency created by the possibility of a
 
 *325
 
 wounded victim had not changed. The ensuing search, which took approximately one minute and consisted of a brief check of the trailer for shooting victims, was appropriately limited to the circumstances that justified it.
 

 Salava argues, however, that even if the police were justified in concluding that there was a “compelling need for official action,”
 
 Tyler,
 
 436 U.S. at 509, 98 S.Ct. at 1949, the government has not sustained its burden of establishing the other prong of the exigent circumstances exception — that there was “no time to secure a warrant.”
 
 Id.
 
 We are somewhat troubled by the district court’s failure to make a finding on the question whether the police could have procured a warrant during the one hour and fifteen minutes between the time they began preparing to enter Salava’s trailer and the time they in fact did so.
 
 See United States v. Talkington,
 
 843 F.2d 1041, 1046 (7th Cir.1988) (emphasizing district court’s failure to make a finding on this issue in concluding that Fourth Amendment issue could not “be adjudicated fairly” on the record presented). We also recognize that there may be some value in requiring police to apply for a warrant even where exigent circumstances seem to exist:
 

 No matter how reasonable a warrantless entry may be, unanticipated delays may prevent the police from entering a home immediately____ Had the police immediately begun the process of procuring a warrant [when they decided entry into the house would be necessary], it might have been available at the time of entry, eliminating any possibility of a Fourth Amendment violation or the exclusion of incriminating evidence.
 

 United States v. Aquino,
 
 836 F.2d 1268, 1273 (10th Cir.1988). In this case, however, we think that the circumstances may have justified the warrantless entry despite the officers’ failure to seek a warrant.
 

 The police here had little control over the timing of their entry; they did not know whether Salava was in the trailer, from which he might take some violent action at any moment, or whether he was somewhere in the vicinity and might show up without warning. More importantly, applying for a warrant would have been a pure formality in this case. The police intended to enter the trailer as soon as they could do so without unreasonable risk to themselves. Had they applied for a warrant and then completed their preparations for entry before the warrant was actually procured, the emergency situation they faced would certainly have justified their entry at that point in any event. Thus, requiring the police to seek a warrant in this situation would add little or no protection to Salava’s privacy interests. We stress, however, the unique factual scenario this case appears to present. Like the Tenth Circuit, we “do not here hold that the presence of exigent circumstances obviates the need for a warrant in any subsequent search, no matter how long delayed.”
 
 Aquino,
 
 836 F.2d at 1274. Instead, we leave it to the district court to explore the reasonableness of the officers’ actions more fully in the event that there is a retrial.
 

 IV.
 

 For the foregoing reasons, the judgment of the district court is Reversed.
 

 [1]
 

 . Dr. Diamond stated in his report that "[b]oth in presentation and history, [Salava] seems to have gone through multiple mini-psychotic episodes.” Psychiatric Evaluation at 2 (May 30, 1991). This testimony certainly is relevant to proving that Salava has a severe mental disease. Although there may be some doubt as to how much weight should be accorded Dr. Diamond’s evaluation, given that it was based on Salava’s own descriptions of his history and symptoms, that is an issue for the jury, not one of admissibility.
 
 West,
 
 962 F.2d at 1248.
 

 [2]
 

 .
 
 We use the term "warrantless search" to refer only to the brief -search of Salava's trailer that occurred immediately after he and Vasfaret arrived at the trailer. The later search that was made with Vasfaret’s consent was also "warrant-less,” but Salava does not challenge its legality on appeal.