UNITED STATES of America, Appellee,

v.

Luis CARTAGENA–CARRASQUILLO, Defendant, Appellant.

UNITED STATES of America, Appellee,

v.

Carlos LUGO–LOPEZ, Defendant, Appellant.

UNITED STATES of America, Appellee,

v.

Jose L. FIGUEROA–GARCIA, Defendant, Appellant.

Nos. 94–1235, 94–1236 and 94–2127.

United States Court of Appeals, First Circuit.

Heard Nov. 6, 1995.

Decided Dec. 1, 1995.

Roberto Roldán Burgos, Rio Piedras, PR, by appointment of the court, for appellant Cartagena–Carrasquillo.

Miriam Ramos Grateroles, Bayamon, PR, by appointment of the court, for appellant Lugo–López.

Theodore L. Craft, Melrose, MA, by appointment of the court, for appellant Figueroa–García.

Nelson Pérez–Sosa, Assistant United States Attorney, with whom Guillermo Gil, United States Attorney, Washington, DC, was on brief, for appellee.

Before TORRUELLA, Chief Judge, LYNCH, Circuit Judge, and WATSON,[*] Senior Judge.

LYNCH, Circuit Judge.

Cocaine trafficking in Puerto Rico resulted in the criminal convictions of the three appellants, who raise issues primarily as to the conduct of their trials. Two issues—the exclusion of expert evidence attempting to establish an insanity defense based on Post-traumatic Stress Disorder claimed to have resulted from military service in Vietnam and the prosecutor's ill-considered reference to religion in his closing argument—merit close discussion. We affirm, rejecting the defendants' challenges on these and other grounds.

*Facts and Trial Proceedings*

In the summer of 1992, Jefferson Morán, a special agent with the Drug Enforcement Administration ("DEA"), learned from a confidential informant, Ramón Malavé, that defendant Carlos Lugo–López was interested in selling kilogram quantities of cocaine. On instruction from Morán, Malavé confirmed

Lugo–López' interest in a phone conversation and later called to negotiate the purchase of two kilograms of cocaine. Malavé told Lugo–López that he could page Morán (whom Malavé said would handle the money) when he was ready to make the transactions. Lugo–López had Morán paged. Lugo–López left a message for Morán that the "contracts" were ready and that he should drop by Lugo–López' house to pick them up.

Malavé went to the Lugo–López residence, where he met the supplier, defendant Luis Cartagena–Carrasquillo. Cartagena–Carrasquillo left, saying that he would return right away with the drugs. Cartagena–Carrasquillo later returned with defendant José L. Figueroa–García and a bag. They went to a room at the rear of the carport where Cartagena–Carrasquillo opened the bag and took out a kilo of cocaine.

During phone conversations between Morán and Malavé while Malavé was at Lugo–López' house, Malavé said two men had arrived to sell two of the four kilograms of cocaine in the bag. Lugo–López asked Malavé to call his partner, Morán, to come and put up the money. In a round robin, Lugo–López kept insisting that the money be brought to his house while Malavé, on instructions from Morán, tried to lure Lugo–López to San Juan (where an arrest would be easier) with promises he would be paid there. At some point during the series of pages and telephone calls, Cartagena–Carrasquillo and Figueroa–García left to sell one of the kilos to another. When the two returned, Lugo–López and Malavé were still sallying about where the sale would take place. Cartagena–Carrasquillo got upset with the delay and left in a car with Figueroa–García.

Law enforcement agents shadowed the car, driven by Figueroa–García, and saw Cartagena–Carrasquillo get out of the car carrying a tan bag. When agents approached him, he got back into the car and fled with Figueroa–García. A car chase resulted, ending in a public housing project. The two men fled by foot and were ultimately arrested. Cartagena–Carrasquillo, who had the tan bag in his hands when he aban-

[*] Of the U.S. Court of International Trade, sitting by designation.

doned the car, did not have it when he was arrested. Agents later found it in a trash can in the area where he first fled on foot. It contained three kilograms of cocaine and $12,900 in cash.

On June 17, 1992, a grand jury returned a four-count indictment charging that Lugo–López, Cartagena–Carrasquillo, Figueroa–García, and another, aiding and abetting each other, possessed with intent to distribute some 3303.96 grams of cocaine in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. Lugo–López was also charged in two counts with using a telephone in furtherance of drug distribution in violation of 21 U.S.C. § 843(b).

Trial started on November 30, 1993. After four days of testimony, defendants requested and were granted a mistrial. Cartagena–Carrasquillo and Lugo–López moved for dismissal on double jeopardy grounds. The district court's denial of the motion was appealed.

While that appeal was pending, this case went to trial for the second time on February 14, 1994. The defendants were found guilty of all counts. The appeals from the conviction were consolidated with the appeals from the denial of the motion to dismiss on grounds of double jeopardy.

*Post–Traumatic Stress Disorder*

Lugo–López argues there was error in the exclusion of his proffered expert testimony that he suffered from Post-Traumatic Stress Disorder ("PTSD") and his attempts to base an insanity defense on PTSD.[1]

■ The insanity defense, set forth at 18 U.S.C. § 17, is an affirmative defense. The burden is on the defendant to show by clear and convincing evidence, *see* 18 U.S.C. § 17(b), that:

at the time of the commission of the acts constituting the offense, the defendant, as a result of a severe mental disease or defect, was unable to appreciate the nature

and quality or the wrongfulness of his acts. Mental disease or defect does not otherwise constitute a defense.

18 U.S.C. § 17(a). There is a procedural component to assertion of the defense as well. Rule 12.2 of the Federal Rules of Criminal Procedure requires that notice of an intention to raise the insanity defense must be given by the defendant to the government "within the time provided for the filing of pretrial motions or at such later time as the court may direct." If such notice is not given, the insanity defense may not be raised.

■ The trial court excluded the PTSD evidence primarily because it felt inadequate notice had been given and secondarily because it thought the evidence was insufficient in any event. The standard of review for excluding the testimony under Rule 12.2 is abuse of discretion. *See United States v. Cameron,* 907 F.2d 1051, 1059 (11th Cir. 1990); *United States v. Weaver,* 882 F.2d 1128, 1136 (7th Cir.), *cert. denied sub nom. Schmanke v. United States,* 493 U.S. 968, 110 S.Ct. 415, 107 L.Ed.2d 380 (1989); *United States v. Duggan,* 743 F.2d 59, 80 (2d Cir. 1984). A district court's decision to admit or exclude expert testimony is entitled to great deference and will be reversed only if: (1) the decision was based on an incorrect legal standard or (2) the reviewing court has a " 'definite and firm conviction that the court made a clear error of judgment in the conclusion it reached based upon a weighing of the relevant factors.' " *United States v. Shay,* 57 F.3d 126, 132 (1st Cir.1995) (quoting *United States v. Benavente Gomez,* 921 F.2d 378, 384 (1st Cir.1990)); *see also United States v. Brien,* 59 F.3d 274, 277 (1st Cir.1995) ("[T]rial judges have traditionally been afforded wide discretion to admit or exclude expert evidence."), *cert. denied,* —— U.S. ——, 116 S.Ct. 401, 133 L.Ed.2d 320 (1995).

---

1. Lugo–López is a Vietnam veteran who asserted he was exposed to Agent Orange, has been hospitalized for mental illness and had been diagnosed as schizophrenic. He also asserted that he suffers from PTSD, which is a mental disorder recognized in the *Diagnostic and Statistical Manual of Mental Disorders* 424–29 (4th ed.1994). PTSD is caused by exposure to an extreme trau-

matic stressor involving actual or threatened death or serious injury or other threat to one's physical integrity and tends to result in symptoms such as re-experiencing the traumatic event, a tendency to avoid stimuli associated with the trauma, numbing of general responsiveness, and increased arousal. *Id.* at 424.

The insanity defense was not raised in the aborted first trial, nor was it raised when Lugo–López asserted and lost the issue of whether he was competent to stand trial. One month after the mistrial, Lugo–López first filed a written motion on January 11, 1994, giving notice of a PTSD defense. The motion indicated that Lugo–López would present the testimony of both Luis Falcón-Torres, his caseworker at the Puerto Rico Vietnam Veteran's Assistance Program, and an as yet unnamed expert on PTSD. The motion also said that the facts surrounding the commission of the crime showed that defendant was suffering from delusions or a disease or disorder that affected his conduct. The motion was discussed in a February 1, 1994 status conference and the judge hearing that motion "noted" that Lugo–López "shall raise at trial the defense of insanity" and that "[t]he issue whether post traumatic stress disorder is admissible shall be resolved at trial."

The government, aware only of psychiatric evaluations performed by a Dr. Cabrera earlier on defendant's competence to stand trial, on February 4 requested a preliminary hearing on the admissibility of the proposed PTSD testimony. On February 9, Lugo–López responded and filed a motion stating his intent to offer a Dr. Santiago as his expert witness and requesting authorization for this expert's services. The authorization was granted, and counsel was "reminded that the admissibility of Dr. Santiago's testimony [would be] left to the trial judge."

Trial started before a different judge on February 14. At no time did Lugo–López file proposed instructions on an insanity defense, although on the first day of trial he did file a memorandum of law as to whether PTSD could constitute an insanity defense. On the fifth day of the six-day trial, the issue of the PTSD defense came up indirectly, during colloquy concerning an objection to the social worker's testimony as to Lugo–López' war record and medals. The court noted at a sidebar conference that such testimony would be admissible, if at all,[2] only if

the PTSD defense was admissible and asked to see psychiatric expert's report. Later, after review of the report, the trial court excluded the insanity defense.

■ The defense was, we think, timely raised in light of the pre-trial rulings of the conference judge noting the raising of the defense and reserving the admissibility issue to trial and the later authorization of the retention of the psychiatric expert. *See Cameron*, 907 F.2d at 1059. But we also hold that there was no abuse in excluding the testimony proffered for certain other reasons stated by the trial judge. The trial judge found that Dr. Santiago's report was at best conclusory in that it did "not show in what way the PTSD syndrome could relieve the defendant of the responsibility for the crimes charged"; that the testimony was insufficient as a matter of law in that it did not go to Lugo–López' state of mind on the dates of commission of the crimes charged, and that it would be unduly prejudicial in violation of Rule 403 in light of its lesser probative value.

The only witness proffered to establish the defense was Dr. Santiago. As to PTSD, the expert's report stated, in pertinent part:

[Lugo–López] justifies his behavior with his special army training and his Viet Nam experience when his main problem is his poor judgment—he cannot anticipate the consequences of his behavior most of the time. His schizophrenic make up adds to his difficulties.

The psychiatrist's diagnosis was that:

[C]ocaine and heroin use and dependency ... together with his schizophrenic make up explain his grandiose and delusional behavior, [e]specially in relation to the informant during investigation.

The report concluded:

There is no doubt that the patient meets the criteria for a P.T.S.D. patient [and] was having delusions when he was being intervened (sic) by a D.E.A. confident (sic) and it is confirmed in the report prepared by D.E.A. agents.... At the time of the

2. The trial judge later ruled the war-record testimony inadmissible for other reasons. Thus, we understand Lugo–López' appeal on the insanity defense issue to be focussed on the exclusion of

the expert testimony of his psychiatrist. The social worker's testimony was not intended to establish the defense; at most it would buttress the psychiatric testimony.

intervention of the D.E.A. representatives, Mr. Lugo because of his delusions of grandeur had a significant mental disease and was unable to conform his conduct to the requirements of the law.

There was no abuse of discretion in excluding the testimony based on this proffer. The report is singularly unfocussed and does not address whether at the time of the commission of the crimes charged, Lugo–López "as a result of a severe mental disease or defect, was unable to appreciate the nature and quality or the wrongfulness of his act." 18 U.S.C. § 17. As the statute itself says, the mere fact of "mental disease or defect does not otherwise constitute a defense." *Id.*

The report does not establish that Lugo–López was suffering from a "severe" mental disorder at the time of commission of the offenses; at most, it characterizes his claimed disorder as "significant." Indeed, the report recounts that by 1992, the year of the crime, Lugo–López had stopped using his drugs of choice, heroin and cocaine. His hospitalizations for schizophrenia had been more than a decade before. His mental status at the time of Dr. Santiago's examination was described as "mild[ly] to moderate[ly] depress[ed]," "logical and coherent" but at times "irrelevant," "well oriented in time, place, and person," suffering from "poor judgment" and being "insecure." The legislative history of 18 U.S.C. § 17 reveals that:

> The concept of severity was added to emphasize that non-psychotic behavior disorders or neuroses such as an "inadequate personality," "immature personality," or a pattern of "anti-social tendencies" do not constitute the defense.

S.Rep. No. 98–225, 98th Cong., 2d Sess. 229 (1984), *reprinted in* U.S.C.C.A.N. 3182, 3411, *quoted in United States v. Salava,* 978 F.2d 320, 323 (7th Cir.1992).

There is nothing in the psychiatrist's report which suggests that the defendant did not know or could not appreciate that selling cocaine was wrong. At best, the report accepts and repeats Lugo–López' statements that he was suffering delusions at the time that Malavé approached him to ask whether he would sell Malavé drugs. Lugo–López said he was "feeling" he was a CIA spy with connections to the police in Haiti. The report does not link such a delusion with an incapacity to determine whether selling cocaine is wrong. Moreover, there is no explanation as to why such delusions would be associated with PTSD. And there is no evidence in the report or otherwise that Lugo–López was suffering from any effects, delusional or otherwise, on the dates when the crimes—the drug transaction and the telephone conversations—actually took place.

The psychiatrist's testimony is the only evidence the defendant offered to establish the insanity defense. The psychiatrist's report is inadequate to establish that as a result of his PTSD Lugo–López was "unable to appreciate the nature and quality or the wrongfulness of his acts." *See* 18 U.S.C. § 17(a); *Duggan,* 743 F.2d at 81 (expert affidavit asserted that "as a result of [PTSD], [defendants] were not able to conform their conduct to the requirements of the law," but contained no evidence or clinical findings in support of these conclusions and was thus inadequate to raise the insanity defense in compliance with Rule 12.2); *see also United States v. Whitehead,* 896 F.2d 432, 435 (9th Cir.1990) (jury not permitted to consider defense where testimony could not establish with convincing clarity that PTSD caused defendant to be unable to appreciate the wrongfulness of bank robbery), *cert. denied,* 498 U.S. 938, 111 S.Ct. 342, 112 L.Ed.2d 306 (1990).[3] The district court did not apply an incorrect legal standard or make an error in judgment in excluding the psychiatrist's testimony.

*Religious Reference*

■ Cartagena–Carrasquillo, who throughout trial wore white clothing, a possible marker of adherence to a minority religious sect, now objects on appeal to the

---

3. We also note, but do not rest our decision on, the trial judge's concern under Rule 403. *Cf. United States v. Shay,* 57 F.3d 126, 133 (1st Cir.1995). The proffered insanity defense, supported only by vague, weak and conclusory testi-

mony, could skeptically be viewed as only a pretext to get before the jury the extremely sad and sympathetic story of a much decorated Vietnam war hero gone far astray.

prosecutor's closing arguments which, in an apparent effort to discredit the defendant's testimony, embraced Catholicism. While the prosecutor's argument was improper, that is not enough to win the day for this defendant, who did not properly make or preserve his objection, and as to whom the evidence of guilt was overwhelming.

We know only from assertions of defense counsel on this appeal, which the government on questioning at oral argument conceded, that Cartagena–Carrasquillo wore white clothing at trial and that this manner of dress in Puerto Rico may symbolize membership in a minority religious group. We do not know, nor apparently did the jury, whether he was in fact a member of such a group nor the strength of the inference that he might be. Nothing was put on the record.

The closing argument, though, is on the record. The prosecutor argued:

> When we live in the same neighborhood, we go to the same church, when we go to church, we come out, we talk to everybody. Now that we are in [L]ent and this is in "Cuaresma", we do "via crusis" where we go from house to house and say a prayer and meet the people there.

The prosecutor's reference to Lent ("Cuaresma"), to doing the way of the cross ("via crusis"), to saying prayers, and the use of the term "we" suggested an alliance between the government and a church to which, presumably, many of the jurors, but not the defendant, belonged. Injection of religion into the case was flatly wrong and contrary to what the public has a right to expect of government prosecutors.

Cartagena–Carrasquillo objected to the reference. The court responded it would hear the objection later at sidebar and asked counsel to keep the objection in mind. During the sidebar conference, the objection was not raised again and there was no request for a curative instruction or other curative action.

Cartagena–Carrasquillo argues that even in the absence of a renewed objection or a request for instruction that the trial judge was obligated to give a curative instruction *sua sponte*. While there may be situations in which the imposition of *sua sponte* obligations on trial judges has been considered, *see, e.g., United States v. Santiago Soto*, 871 F.2d 200, 202 (1st Cir.), *cert. denied*, 493 U.S. 831, 110 S.Ct. 103, 107 L.Ed.2d 66 (1989), we decline to impose one here. Whether an instruction will "cure" a problem or exacerbate it by calling more attention to it than warranted is within the ken of counsel and part of litigation strategy and judgment. The obligation to suggest the appropriate response, if any, rested on defense counsel.

Balancing, on Cartagena–Carrasquillo's part, the failure to properly give notice to the trial court of a desire for remedial instruction, to preserve the issue, or even to create a proper record, against the isolated but seemingly deliberate injection of religion into the case by the prosecutor, we turn to a test adopted by this Court in a more straightforward case, *United States v. Hodge–Balwing*, 952 F.2d 607, 610 (1st Cir.1991). In reviewing whether improper remarks in a closing argument are grounds for reversal in that they "so poisoned the well" that the trial's outcome was likely affected, this court considers the following factors: "(1) whether the prosecutor's conduct was isolated and/or deliberate; (2) whether the trial court gave a strong and explicit cautionary instruction; and (3) whether it is likely that any prejudice ... could have affected the outcome of the case." *Id.*

As to the first prong, "[d]efendant's religion has no bearing whatsoever on any legitimate issue in the case." *United States v. Goldman*, 563 F.2d 501, 504 (1st Cir.1977), *cert. denied*, 434 U.S. 1067, 98 S.Ct. 1245, 55 L.Ed.2d 768 (1978). But a reference to religion does not necessarily require reversal. *Id.* at 505. Second, while there was no curative instruction here, there was no request for one, and we do not discount the possibility that the failure to make the request was a tactical choice by defense counsel. *See United States v. Brandon*, 17 F.3d 409, 446 (1st Cir.1994), *cert. denied sub nom. Granoff v. United States*, — U.S. ——, 115 S.Ct. 80, 130 L.Ed.2d 34 (1994) *and Ward v. United States*, — U.S. ——, 115 S.Ct. 81, 130 L.Ed.2d 34 (1994).

We turn, then, to the third prong of the *Hodge–Balwing* test and ask whether it is likely that any prejudice could have affected the outcome of the case. The religious references in the prosecutor's closing were less a direct appeal to religious prejudice than in other cases we have considered (such as *Goldman*) and there is less reason here to draw an inference of prejudice. On objection, the remarks stopped.

The instructions given to the jury assisted it in keeping to the path before it, free from prejudice. The district court instructed the jury to perform its duty "objectively without any bias or without any prejudice," reminded the jury that the defendants were presumed innocent unless guilt was established beyond a reasonable doubt, told the jury that statements of counsel were not evidence, and explicitly set out the elements of the crimes charged. *See United States v. Giry*, 818 F.2d 120, 132–33 (1st Cir.) (prosecutor's improper closing argument that defendant "sounds like Peter who for the third time denied Christ" was deliberate and unprovoked, but was not objected to and did not produce plain error in light of overall jury instructions, even without an instruction specifically addressed to the prejudicial comment), *cert. denied*, 484 U.S. 855, 108 S.Ct. 162, 98 L.Ed.2d 116 (1987).

Further, the evidence of guilt was very strong. Cartagena–Carrasquillo was introduced by Lugo–López as the supplier. He arrived at the Lugo–López house with a bag containing cocaine. He left the house with the bag, fled when approached by law enforcement agents, led the agents on a car chase, left the car with the bag in hand, and the bag containing cocaine was found soon after the arrests in a trash can in the area where he had been.

*Double Jeopardy*

Both the origins and demise of defendants' double jeopardy claims lie in the termination of the first trial by mistrial.

■ The mistrial was declared by the judge after the government's first witness, Malavé, was observed going into a witness room with DEA special agent Morán. Morán had been assigned to protect the witness, a confidential informant and the only witness to the drug transaction. The court had given a general instruction to all witnesses not to talk about their testimony. Although there was no evidence of violation of that instruction, an objection by defense counsel to the two talking precipitated a defense motion for mistrial, which was allowed. The trial court specifically held that there was no misconduct by the prosecutor and no intent to goad a mistrial. Those fact findings are subject to a clearly erroneous standard of review. *United States v. Serra*, 882 F.2d 471, 473 (11th Cir.1989). The trial court's denial of defendants' motion to dismiss based on double jeopardy is subject to *de novo* review. *United States v. Aguilar–Aranceta*, 957 F.2d 18, 21 (1st Cir.), *cert. denied*, 506 U.S. 834, 113 S.Ct. 105, 121 L.Ed.2d 64 (1992).

Defendants contend that the conduct of the government's witness and the DEA agent was designed to produce a mistrial. This is based on a theory that the witness felt he had not testified well, that he attempted to signal his discomfort to the prosecution in full view of the defense, and that the hostility expressed by the DEA agent to defense counsel when they confronted him about meeting with the witness all were intended to goad defendants into moving for a mistrial. The government's hypothesized gain would be a second chance for its key witness to do a better job. Theory is not fact and the trial court specifically rejected the theory as not based on the facts. Nothing in the record suggests its findings were clearly erroneous.

■ Because the defendants consented to the mistrial declaration and because there was no basis to conclude that the conduct giving rise to the mistrial was intended to provoke the defendant into moving for a mistrial, there was no double jeopardy bar to reprosecution. *Oregon v. Kennedy*, 456 U.S. 667, 675–76, 102 S.Ct. 2083, 2088–89, 72 L.Ed.2d 416 (1982); *United States v. Perez Sanchez*, 806 F.2d 7, 8 (1st Cir.1986), *cert. denied*, 480 U.S. 922, 107 S.Ct. 1383, 94 L.Ed.2d 697 (1987). "Only where the governmental conduct in question is intended to 'goad' the defendant into moving for a mistrial may a defendant raise the bar of double jeopardy to a second trial after having suc-

ceeded in aborting the first on his own motion." *Kennedy,* 456 U.S. at 676, 102 S.Ct. at 2089.

*Filing of Information Under 21 U.S.C. § 851*

 Late on February 10, 1994, the day before jury selection started for the second trial, the government filed and faxed to counsel for Lugo–López an information under 21 U.S.C. § 851(a)(1) seeking an enhancement of penalties. While such cliff-hanging practices are not wise, the filing was made before jury selection, and that is all that was required. *Kelly v. United States,* 29 F.3d 1107, 1110 (7th Cir.1994) (citing cases). That the information was not filed during the first trial did not bar the government from seeking an enhanced penalty during the second, unless the government sought to punish the defendant for exercising a constitutional or statutory right. *See United States v. Goodwin,* 457 U.S. 368, 384, 102 S.Ct. 2485, 2494, 73 L.Ed.2d 74 (1982). Lugo–López alleges that the prosecution made the last minute filing of the information out of prosecutorial vindictiveness arising from earlier dealings in the case. Even if seeking an enhancement before the second trial that was not sought before an earlier trial were sufficiently likely to be vindictive so as to warrant a presumption of vindictiveness, the prosecutor here rebutted that presumption. *See United States v. Marrapese,* 826 F.2d 145, 149 (1st Cir.), *cert. denied,* 484 U.S. 944, 108 S.Ct. 331, 98 L.Ed.2d 358 (1987). The district court, after hearing the government's reasons for the eve-of-trial filing, determined that there was no vindictiveness. There is no reason to disturb that finding.

 Lugo–López also contends that the information was signed by an unauthorized person and contained certain mistakes of fact. This contention is unavailing. Even assuming that an Assistant United States Attorney was not authorized to sign the information, that and the other mistakes could be and were corrected prior to pronouncement of the sentence, as permitted under the statute.

*Sufficiency of the Evidence*

The claims by Cartagena–Carrasquillo and Figueroa–García that the evidence was insufficient to support their convictions are without merit, as the description of the facts of record amply demonstrates.

*Chain of Custody*

 Cartagena–Carrasquillo challenges the chain of custody of the cocaine. Chain of custody arguments usually go to the weight of the evidence and not admissibility. *United States v. Ortiz,* 966 F.2d 707, 716 (1st Cir.1992), *cert. denied,* — U.S. —, 113 S.Ct. 1005, 122 L.Ed.2d 154 (1993); *United States v. Luna,* 585 F.2d 1, 6 (1st Cir.), *cert. denied,* 439 U.S. 852, 99 S.Ct. 160, 58 L.Ed.2d 157 (1978). Review is for abuse of discretion. *Ortiz,* 966 F.2d at 716.

Defendant argues that the deal was for 2 kilograms of cocaine while the amount found in the tan bag was 3 kilograms, that one bag of cocaine was opened while at the Lugo–López house, but that no bags were opened when the DEA agents found them, and that the bags were found abandoned in a high crime area. From this, the defendant says, there is a chance of altered or substituted evidence. This is a classic weight of the evidence argument.

 The government agents testified as to proper custodial procedures and the evidence suggests plausible explanations for the discrepancies noted. One such explanation is that there were four kilograms originally, that the opened one kilogram bag of cocaine was sold to another when Cartagena–Carrasquillo left Lugo–López' house to make a sale, thus accounting for the remaining 3 kilograms of cocaine and the $12,900 in cash found in the bag later.

*Other Evidentiary Rulings*

 Lugo–López complains that the trial court erred in curtailing the cross-examination of an informant. Limitations on the cross-examination of a witness are reviewed for abuse of discretion. *United States v. Boylan,* 898 F.2d 230, 254 (1st Cir.), *cert. denied,* 498 U.S. 849, 111 S.Ct. 139, 112 L.Ed.2d 106 (1990). Although a defendant does have a constitutional right to cross-

examine witnesses against him, U.S. Const. amend. VI, that right is not unlimited. *United States v. Corgain*, 5 F.3d 5, 8 (1st Cir. 1993). Here, the district court refused to allow cross-examination as to the confidential informant's failure to file income tax returns. The informant's motive and potential bias had already been established. Defense counsel also had already pointed out many inconsistencies in his trial testimony as well as discrepancies between the informant's testimony at trial and his earlier testimony both before the grand jury and at the mistrial. The jury had ample information from which to gauge the credibility of this witness. *See, e.g., United States v. Rodriguez*, 63 F.3d 1159, 1168 (1st Cir.1995). The trial court did not abuse its discretion in limiting cross-examination on the failure to file income tax returns.

██ Lugo–López also complains about the district court's allowance of the withdrawal of a number of pages of a trial transcript that had previously been admitted. There was no objection to this withdrawal by Lugo–López at the time; he waited until after the verdicts had been returned. Even assuming that we should consider this issue given the late objection, the error, if any, was harmless. The district court ruled that this portion of the transcript was inadmissible as irrelevant and confusing to the jury. Such was well within its discretion. Moreover, the only purpose defendant gives to be served by the portion of the transcript that was withdrawn was to further undermine the credibility of the confidential informant. Because the jury had enough information to determine such credibility, there was no prejudice.

██ Cartagena–Carrasquillo argues that the district court erred in allowing a DEA agent to give his opinion that annotations on the back of a business presentation card were related to a drug transaction. Cartagena–Carrasquillo argues that the annotations were simply the addition of numbers, facially innocent. This court has previously held that it was well within a trial court's discretion to admit expert testimony identifying a similar document—a column of numbers added together—as a drug ledger and explaining its contents. *United States v. Echeverri*, 982

F.2d 675, 680–81 (1st Cir.1993). There was similarly no abuse of discretion here.

*Sentencing*

Figueroa–García asserts he should not have received any more than the mandatory minimum sentence of 60 months, because, he asserts, there was never any evidence of his guilt or, at least, hardly any evidence. The jury found otherwise. He was sentenced to 78 months after the court found he had not accepted responsibility and so was ineligible for a two-level decrease under U.S.S.G. § 3E1.1(a). He claims he was entitled to a reduction as a minor participant under U.S.S.G. § 3B1.2(a).

██ The defendant has the burden of showing that he is entitled to a reduction in his offense level under § 3B1.2(a). *United States v. Ocasio*, 914 F.2d 330, 332 (1st Cir. 1990). On appeal, the defendant must establish that the district court's determination was clearly erroneous. *Id.* at 333. Defendant has not met that burden. The evidence clearly shows that he was more than a minor participant in the criminal venture. He and Cartagena–Carrasquillo arrived at the Lugo–López house together with kilogram quantities of cocaine. They left together to sell a kilogram to someone else and returned together. When the transaction with the confidential informant failed, Figueroa–García drove Cartagena–Carrasquillo away. Figueroa–García then led the agents in a car chase and fled from the law. The district court did not clearly err by denying a reduction under § 3B1.2(a). Figueroa–García was not a minor participant.

*Affirmed.*