OPINION
SLOVITER, Circuit Judge.
Romel Bolger, Latoya Kirkland, and Kenneth Thompson appeal the District Court’s denial of their motion to suppress evidence, including numerous kilos of cocaine, used against them at trial; Bolger and Thompson appeal the sufficiency of the evidence upon which their convictions for possession with intent to distribute cocaine and cocaine base rest; and Bolger appeals the District Court’s enhancement of his Guidelines calculation for possessing a firearm in connection with a drug trafficking offense.
I.
Background
After shots were fired near the intersection of Levick Street and Summerdale Avenue in Philadelphia, police found Bolger on the median of Levick Street, bleeding from the mouth and chest from a gunshot wound. In the nearby driveway of the house at 1053 Levick Street officers found a handgun, shell casings, and two cars with bullet holes, including a blue Ford Expedition with both its front doors open.
Officers Barclay and Erbele interviewed a witness at the scene who, the government asserts, told them that there had been a shoot-out between two groups of men, after which someone involved may have pulled a child from the Expedition and then entered 1053 Levick Street. Those officers also saw lights on in 1053 Levick and heard water running inside. One officer knocked on the door to no response. Erbele and Barclay concluded that someone injured in the shoot-out might be inside and, approximately ten minutes later, Erbele called his supervisor, Lieutenant Mangini of the SWAT team.
Mangini, who arrived about fifteen to twenty minutes later, and Erbele decided that the known facts merited entry into the building and that there was no time to secure a warrant. Within ten to fifteen minutes, the SWAT team was gathered, knocked on the door, announced their intent to check the “well-being” of the inhabitants loud enough that “everybody on [the] block [could] hear,” and received no answer. App. at 202. SWAT knocked again, received no response, and entered the building.
Just inside the door, the officers found a loaded handgun. Deeper inside the house, they discovered two more guns, sixty-one kilograms of cocaine, several bags of crack cocaine, and approximately $176,365. On one desk they found one “unwrapped” and two “wrapped” kilos of cocaine, at least one baggie with crack cocaine, a heat sealer with Thompson’s fingerprints, ziplock bags, a gun placed on top of a newspaper dated November 22, 2006, a notebook that appeared to be a drug ledger, and a scale with Bolger’s and Thompson’s fingerprints.
Investigation revealed that both Thompson and Kirkland resided at 1053 Levick. Bolger, Thompson and Kirkland were indicted for conspiracy to possess with intent to distribute cocaine and cocaine base *409 (Count I), and conspiracy and aiding and abetting a conspiracy to maintain a house for the purposes of drug trafficking (Count II); Bolger and Thompson were indicted for possession on or about November 25, 2006 with intent to distribute cocaine (Count III) and crack cocaine (Count IV) and with aiding and abetting those offenses, and with possession, and aiding and abetting possession, of a weapon in furtherance of a drug trafficking crime (Count V); and Thompson was indicted as a convicted felon possessing a firearm (Count VI).
A. The motions to suppress
The defendants all moved to suppress the evidence found in the house, arguing that the warrantless search was prohibited by the Fourth Amendment because it was unreasonable for the police to believe that an injured person might have been inside 1058 Levick. The District Court held an evidentiary hearing at which Barclay testified that a witness, later identified as James Antoine, had told him at the scene that he was standing near the driveway of 1053 Levick when some men walked past, after which he heard shooting and dove under his car; after the shooting stopped, he “saw a male run down the driveway with a gun, [then go] back to a vehicle which was parked in the rear of 1053 Levick, extract a small child, run back down the driveway eastbound and then run back westbound in the driveway ... [and that] he thought he saw the male run into the house.” App. at 169. Erbele testified that a witness he spoke to — also presumably Antoine — said that he saw “a male holding a child, a small child ... running around up by where [Antoine’s] car was ... and ... that he said he thought he saw somebody going into [1053 Levick].” App. at 147.
The District Court denied the motions to suppress, apparently because of the evidence of exigent circumstances. Defendants moved for reconsideration on the basis of a document subsequently produced by the government that contained a summary of an interview of Antoine taken the night of the incident by an Officer Casee which purportedly contradicted the testimony of Barclay and Erbele. The Court held a second hearing at which Antoine was questioned about what he had observed regarding persons entering the Levick Street house. At one point, Antoine stated, “I don’t see nothing [from] where I stand, I can see nobody.” App. at 268. Pressed to clarify whether he told the police that he “saw anybody go to the back door of 1053 Levick Street,” Antoine answered, “I just say I don’t remember the house number, like I say I don’t remember who is in the house.” App. at 269. The Court then asked, “Did you point to the house?”, to which Antoine answered, “Yes, right there I see that in the back but I don’t remember the house.” App. at 269. The prosecution followed up by asking, “When you pointed to the house, you said you saw someone go to that door?”, and Antoine answered, “I don’t see someone go to the door, just argue back right here, the argument right here, that’s all.” App. at 269-70.
Erbele also testified, reiterating his former testimony but clarifying that, after speaking with Antoine the day of the shoot-out, he did not believe that Antoine knew where the man with the child went.
The District Court again denied the motions to suppress and supplemented its fact-findings by stating: “Antoine saw a male with a small child go up the driveway, return to the rear of 1053 Levick Street and then proceed towards Summer-dale Avenue ... Antoine [later] informed a uniformed officer at the scene ... what he had seen and heard.... Antoine, a Haitian, speaks with a heavy accent and is difficult to understand.... Sergeant Bar *410 clay understood Antoine to report that a person with a small child may have gone into the property at 1053 Levick Street.... Barclay informed [Officer] Er-bele what he believed Antoine had seen.” Supp.App. at 98.
B. The trial and post-trial
A jury convicted Thompson of Counts I through IV; Bolger was convicted of Counts III and IV; and Kirkland was convicted of Count II. The District Court denied Bolger’s motion for acquittal. At sentencing, the Court enhanced Bolger’s Guidelines calculation by two points under U.S. Sentencing Guidelines § 2Dl.l(b)(l) (2007) for possessing a dangerous weapon in connection with a drug trafficking offense.
II.
Discussion[1]
A. Suppression
Defendants argue that the evidence should have been suppressed because of the absence of a warrant. Warrantless entry into a home is permitted “to assist persons who are seriously injured or threatened with such injury,” Brigham City v. Stuart, 547 U.S. 398, 403, 126 S.Ct. 1943, 164 L.Ed.2d 650 (2006), but the “government must show a reasonable basis, approximating probable cause, both for the officers’ belief that an emergency exists and for linking the perceived emergency with the area or place into which they propose to intrude,” United States v. Martins, 413 F.3d 139, 147 (1st Cir.2005), cert. denied, 546 U.S. 1011, 126 S.Ct. 644, 163 L.Ed.2d 520 (2005). “We review the denial of a suppression motion for clear error as to the underlying facts, but exercise plenary review as to its legality in light of the district court’s properly found facts.” United States v. Coles, 437 F.3d 361, 365 (3d Cir.2006). “The presence of exigent circumstances is a finding of fact, which we review for clear error.” Id. at 366 (citation omitted).
The reviewing court must make an “objective assessment of an officer’s actions in light of the facts and circumstances then known to him,” Scott v. United States, 436 U.S. 128, 137, 98 S.Ct. 1717, 56 L.Ed.2d 168 (1978), “in light of the totality of the circumstances confronting the officers, including ... a need for an on-the-spot judgment based on incomplete information and sometimes ambiguous facts bearing upon the potential for serious consequences,” Martins, 413 F.3d at 147. The government bears the burden of proving exigency. Parkhurst v. Trapp, 77 F.3d 707, 711 (3d Cir.1996).
Defendants argue that the testimony given by Barclay and Erbele is “outrageously suspect” because it conflicts with Antoine’s testimony and because the officers did not note that “someone went into the house with the child” as part of “their ’49,’ which is their formal Police Report.” Appellants’ Br. at 12-13. Defendants argue further that “even if [Antoine] said that he ‘thought’ [he saw someone go] into the house, ... [that is] still ... not enough to establish probable cause or an exigent circumstance,” because “the man who took the child was in no way tied to the shooting in question,” and there “was nothing ... to indicate that either the man or the child was hurt in any way ... [including] no blood leading in or out of the home ... or other noise that might indicate an emergency....” Appellants’ Br. at 13. The Defendants also assert that there was no “imminence” to whatever danger existed because the police did not “rush[] into the home to save the child *411 that they feared might be coming to harm.” Appellants’ Brief at 19.
We reject these arguments. The District Court found that Antoine and Officers Barclay and Erbele were all credible witnesses, and explained that the discrepancies between the officers’ testimony and Antoine’s testimony were due the Officers’ difficulty in understanding Antoine’s Haitian accent. This was not clear error. Both Erbele and Casee testified that they found it difficult to understand Antoine, and a fair reading of his testimony supports the genuineness of those assertions. Adding to the possible confusion, Antoine pointed at 1053 Levick while speaking with Barclay and Erbele.
To be sure, there was some confusion between the officers about what Antoine said, but this is unsurprising considering the interviews were conducted at the scene of a shoot-out. Barclay’s testimony is of debatable relevance given that Erbele spoke with Antoine after Barclay and it was Mangini and Erbele who together made the decision to enter the house, apparently based primarily on the information provided by Erbele. Still, Erbele had the following information: (1) there was a shoot-out; (2) a witness had said that soon after the shooting concluded someone might have entered 1053 Levick, a house adjacent to the scene of the shoot-out; (3) that person may have taken a child from the bullet-ridden Expedition, or may have been involved in the shoot-out, or both; (4) a witness told Erbele that more than one person had exited the Expedition, which had both its front doors open; and (5) there was water running in the house, the lights were on, and no one answered when the police knocked and announced their presence. These facts made the warrant-less search reasonable.
Defendants’ argument about the “49”— which does not appear in the record — is unconvincing. That document apparently reflects a statement by Erbele that a “male had taken a small child from the rear of a 2004 Expedition” and that “the male fled with the small child.” App at 158. That is not inconsistent with Erbele’s belief that the male could have entered 1053 Levick. Moreover, neither Erbele nor Barclay created or reviewed the 49, and both claim that they told whoever wrote that document the same information to which they testified at the suppression hearing.
We also reject Defendants’ argument that there was no exigency because the officers waited for the SWAT team. The time it took to collect information, call SWAT, decide to enter the building, then prepare to do so, was reasonable. It is well recognized that police officers can take “reasonable precautions to reduce the risk of serious injury to themselves or others.... ” Causey v. City of Bay City, 442 F.3d 524, 531 (6th Cir.2006) (quoting United States v. Salava, 978 F.2d 320, 324 (7th Cir.1992)). There was evidence that it was police procedure to wait for the SWAT team to enter a building when an armed person might be inside.
Defendants argue in the alternative that, even if the police were justified in entering the house, they were not justified in going past the entryway because “they could have called out” to see if anyone was hurt and because “there was no blood found; there was no loud noise nor screaming nor anything else that would have indicated that someone needed help.” Appellants’ Br. at 22. Defendants further assert that “the gun [found] on the floor” by the SWAT team “is immaterial” because “it is not against the law to have a gun in the home.” Appellants’ Br. at 22. The presence of the gun, however, increased the possibility that someone connected to the shoot-out was inside and in need of help, and the police had already “called out” *412 before they entered the house and received no response. We will not disturb the District Court’s denial of the motion to suppress.
B. Sufficiency of the evidence
In support of their contention that they were entitled to a judgment of acquittal, Bolger and Thompson argue that a reasonable jury could not have found beyond a reasonable doubt that they possessed the drugs recovered from 1053 Levick because “mere proximity to the drug, or mere presence on the property where it is located or mere association with the person who does control the drug or the property, is insufficient to support a finding of possession,” United State v. Brown, 3 F.3d 673, 680 (3d Cir.1993) (citation omitted), and because the government “failed to demonstrate that [they] possessed any of the drugs ... on any date relevant to the prosecution,” Appellants’ Reply Br. at 21 (citing United States v. Hall, 473 F.3d 1295, 1309 (10th Cir.2007) (reversing conviction for possession of crack because “[w]hile [the] evidence [might have been] sufficient to establish that [defendant] possessed crack-cocaine at some time, the indictment charged [defendant] with possession and distribution on or about April 7, 2001 .... [and][n]one of [the] evidence shows that [defendant] possessed or distributed crack-cocaine at that time.”))
There was, however, substantial evidence from which the jury could convict Thompson of constructive possession of cocaine and crack on or about November 25, 2006: Thompson admits, and there was ample evidence from which the jury could infer, that he resided at 1053 Levick Street where large amounts of drugs and drug paraphernalia were found in plain sight; Thompson’s fingerprints were found on the scale and on the heat-sealer, which were next to kilos of cocaine; his fingerprints were also found on a drawer of that desk which contained a bag with a chunky white substance inside; there was evidence that those items had been placed there within a day of the shoot-out, including testimony by Brenda Kirkland, the aunt of Latoya Kirkland, that she had been in the apartment the day before the shoot-out, and had seen Thompson, but that the cocaine, gun, scale, etc., were not on the desk then; there was ample testimony that Thompson was present for the shoot-out and that it was he who retrieved his young son from the Expedition; and there was a “box of money” in the bedroom identified as Thompson’s.
There was also sufficient evidence to convict Bolger of aiding and abetting: four of his fingerprints were found on the recently-placed scale which, again, was next to an open package of drugs, baggies, and a heat sealer; Bolger was shot in the driveway outside 1053 Levick where, again, drugs were set-out in plain sight; three of his fingerprints were found on a glass in the kitchen near pots which seem to have been used in cooking crack cocaine; Bolger does not dispute that his street name was “Big Homie” and the notation “BH” in the notebook cum drug ledger was placed next to the number “1000” and the words “last run”; there were hundreds of phone calls placed between Bolger and Thompson, twelve of which were placed between November 22 and November 24; and there was substantial other evidence connecting Bolger with Thompson and with 1053 Levick. From this evidence, the jury could infer that Bolger had been helping, or was about to help, Thompson package drugs for sale. “Actual or constructive possession need not be shown to justify a conviction for aiding and abetting possession, only ‘some affirmative participation which at least encourages the principal offender to commit the offense.’” United States v. Frorup, *413 963 F.2d 41, 43 (3d Cir.1992) (quoting United States v. Raper, 676 F.2d 841, 850 (D.C.Cir.1982)).
C. Bolger’s sentencing enhancement
Bolger argues that the District Court erred in finding that he possessed a Springfield Armory Ultra handgun found in the driveway of 1053 Levick. We disagree. It is undisputed that Bolger was present in that driveway just before the gun was discovered by the police. Also, at Bolger’s sentencing, the government called Agent Monahan who testified that the Springfield was traced to a man named Frost, who had purchased guns for Tull[2] who told Monahan that he had supplied a Springfield to Bolger. Tull also told Monahan that he remembered that gun because it had three holes in the trigger and because it was all-metal and was therefore particularly heavy.
This evidence suffices to show that Bol-ger possessed the gun during the Shoot-out in the driveway of 1053 Levick. “[T]his Court ... review[s] factual findings relevant to the Guidelines for clear error and ... exercise[s] plenary review over a district court’s interpretation of the Guidelines.” United States v. Grier, 475 F.3d 556, 570 (3d Cir.2007) (en banc).
A District Court must apply a two-level Guidelines offense level increase if “a dangerous weapon (including a firearm) was possessed” in connection with a drug trafficking offense. U.S.S.G. § 2Dl.l(b)(l) (2007). “The adjustment should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense.” U.S.S.G. 2D1.1 cmt. n. 3 (2007). There is no such improbability here.
III.
Conclusion
For the above-stated reasons, we will affirm the orders of the District Court.

. The District Court had jurisdiction under 18 U.S.C. § 3231 and this court has jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742.

. Tull had also testified during a hearing at trial that he had sold Bolger guns.