USCA1 Opinion

 

 United States Court of Appeals United States Court of Appeals For the First Circuit For the First Circuit ____________________ No. 95-1291 UNITED STATES, Appellee, v. ROBERT WIHBEY, Defendant, Appellant. No. 95-1394 UNITED STATES, Appellee, v. CLAUDE WHITMAN, Defendant, Appellant. ____________________ APPEALS FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. Frank H. Freedman, Senior U.S. District Judge] __________________________ ____________________ Before Cyr, Boudin, and Stahl, Circuit Judges. ______________ ____________________ Jack St. Clair with whom Barbara J. Sweeney was on brief for _______________ ____________________ appellant Wihbey. Vincent A. Bongiorni for appellant Whitman. ____________________ Dina Michael Chaitowitz, Assistant United States Attorney, with ________________________ whom Donald K. Stern, United States Attorney, was on brief for _________________ appellee. ____________________ February 6, 1996 ____________________ STAHL, Circuit Judge. Robert Wihbey and Claude STAHL, Circuit Judge. _____________ Whitman were tried by a jury and convicted of conspiracy to distribute marijuana. The jury also convicted Wihbey of possession of marijuana with intent to distribute. Both Wihbey and Whitman challenge their convictions on the grounds that the prosecutor made improper remarks in closing argument, and that the government proved multiple conspiracies, not the single conspiracy charged in the indictment. Wihbey argues that the warrantless entry of his home was not justified by exigent circumstances and that the evidence against him does not support the drug quantity used to calculate his sentence under the guidelines. Whitman also challenges his sentence, asserting that he did not play a leadership role in the conspiracy that justified an increase in offense level. Finding no error, we affirm the convictions and the resulting sentences. I. I. __ FACTUAL OVERVIEW FACTUAL OVERVIEW ________________ The evidence, taken in the light most favorable to the verdict, permitted the jury to find the following facts. See United States v. Twitty, No. 95-1056, slip op. at 2 (1st ___ _____________ ______ Cir. December 28, 1995). In the spring of 1991, Richard Britt and Thomas Rohan agreed to work together dealing marijuana. Initially, they intended their source of supply to be appellant Claude Whitman and one Frank Camyre, but when -2- 2 Camyre and Whitman repeatedly failed to produce as promised, Rohan cultivated another supplier, Robert Wihbey. Meanwhile, an informant for the Drug Enforcement Administration ("DEA"), David DeCastro, had convinced Britt and Rohan that he had the desire and ability to buy 250 pounds or more of marijuana (about $500,000 worth). Britt and Rohan, eager to recoup an earlier loss in a failed marijuana deal, agreed to act as middlemen in a large sale to informant DeCastro. Britt and Rohan informed both of their sources that they had a big buyer on the hook. On or about November 22, 1991, both sources independently obtained shipments of marijuana. On November 23, 1991, DEA agents arranged for DeCastro to conduct controlled buys the following day from both the Wihbey source and the Whitman/Camyre source. Britt and Rohan were arrested during a buy from Wihbey's associate, Michael Weiner, who was also arrested; all three immediately agreed to cooperate. Weiner led the DEA agents to Wihbey's home, where they arrested Wihbey and searched the premises. Later that day, Britt and Rohan cooperated with the DEA on a second controlled buy, from the Whitman/Camyre source, leading to the arrest of Whitman, Camyre and Whitman's source, Roger Brandt. Further factual details will be provided as needed to analyze the several issues presented. -3- 3 II. II. ___ PROCEDURAL BACKGROUND PROCEDURAL BACKGROUND _____________________ In March 1993, a federal grand jury returned a four-count indictment that charged: in Count One, that from May 1991 through November 23, 1991, Britt, Rohan, Wihbey, Weiner, Whitman, and Camyre conspired to possess with intent to distribute, and to distribute, marijuana in violation of 21 U.S.C. 846; in Count Two, that on October 4, 1991, Camyre possessed marijuana with intent to distribute in violation of 21 U.S.C. 841(a)(1); in Count Three, that on November 22, 1991, Wihbey possessed marijuana with intent to distribute in violation of 21 U.S.C. 841(a)(1); and in Count Four, that on November 23, 1991, Wihbey used a pistol during and in relation to a drug trafficking offense in violation of 21 U.S.C. 924(c). Wihbey filed a motion to suppress physical evidence and a statement obtained from him during the warrantless arrest and search at his home, but the motion was denied after an evidentiary hearing. Prior to trial, all of the defendants except Wihbey and Whitman pleaded guilty and agreed to cooperate with the government. After a five-day trial in May 1994, the jury found Wihbey and Whitman guilty of the conspiracy count and Wihbey guilty of the possession with intent to distribute count. The jury, however, acquitted Wihbey on the firearm count. Wihbey and Whitman -4- 4 were sentenced in November 1994 and promptly filed notices of appeal. III. III. ____ DISCUSSION DISCUSSION __________ A. Warrantless Entry of Wihbey's Home A. Warrantless Entry of Wihbey's Home ______________________________________ 1. Facts _____ The magistrate judge found the following facts at the suppression hearing. The DEA investigation that led to the arrests in this case was focused on a controlled buy of marijuana by the informant DeCastro from Whitman and Camyre, with Britt and Rohan acting as middlemen. It was only one day before the scheduled Whitman/Camyre buy that DEA agents learned that Rohan had another source, Robert Wihbey. Late in the afternoon of Friday, November 22, 1991, Rohan told the informant DeCastro that he had an unnamed source that could deliver 250 pounds of marijuana. When DeCastro expressed his interest in purchasing from both this new source and the Whitman/Camyre source, Britt and Rohan drove DeCastro to the Beekman Place condominiums in Agawam, Massachusetts. DeCastro wore a transmitter, and was under audio and visual surveillance by DEA special agent Sean McDonough and other agents. Rohan parked the car, got out, and returned shortly thereafter with a sample of marijuana for DeCastro's approval. The agents were unable to discern, however, which condominium unit Rohan had entered, nor did they learn the -5- 5 name of the new source. DeCastro approved the sample and he and Rohan scheduled a 250 pound deal to take place at Rohan's residence later that night. Early that evening, DeCastro called Britt to confirm the arrangements, but Britt stated that the delivery would have to be postponed until 8:00 a.m. the following morning, Saturday, November 23, 1991. The following day, Britt and Rohan met DeCastro and brought him to a house (owned by Wihbey, but not used as his residence) at 30 Arden Street in Springfield, Massachusetts. There, DeCastro examined ten pounds of marijuana, and was told by Wihbey's associate, Michael Weiner, that there were thirty more pounds in Weiner's car. Weiner advised the buyers that the rest of the marijuana would be produced in increments after the cash for the first forty pounds was delivered to the source. DeCastro said he had to get his "money man," but he returned instead with special agent McDonough, followed by a number of DEA agents. Britt, Rohan, and Weiner were arrested inside the Arden Street house at about 11:00 a.m.; the DEA still had not learned the identity of the source (Wihbey) or his unit number at Beekman Place. Britt, Rohan, and Weiner promptly agreed to cooperate with the DEA agents, and by 11:15 one or more of them had disclosed that Wihbey was the source and that he lived at 33 Beekman. At the hearing, agent McDonough -6- 6 conceded that at this point he had probable cause to arrest Wihbey and search 33 Beekman. Nonetheless, McDonough had doubts about the credibility of the three arrestees and decided to interview them individually at DEA headquarters; these interviews began at 11:30 that morning. Agent McDonough determined that the cooperating defendants were credible, and based on information they provided, that Wihbey would grow suspicious if Weiner did not return promptly with $68,000 or call to explain the delay. At about the same time, roughly noon, McDonough was also concerned with setting up the controlled buy from Whitman and Camyre. McDonough directed Britt to contact Whitman or Camyre, and the second deal was set up for 3:00 that same afternoon. Thus, McDonough was involved to some extent with setting up the Whitman/Camyre buy at the same time that he was preparing to arrest Wihbey. Because it was Saturday, McDonough believed that application for a warrant to arrest Wihbey in his home might take as long as several hours, and that quick action was necessary because Wihbey's growing suspicion might motivate him to flee or destroy evidence. At approximately 12:45 p.m., the DEA established surveillance of Wihbey's condo, and at 1:00 p.m. Weiner and Rohan entered, followed by special agent McDonough and other agents who "secured the apartment." -7- 7 Wihbey was found lying on the basement floor behind a pool table, with a loaded pistol a few feet away. Agent McDonough placed Wihbey under arrest and advised him of his rights. McDonough then told Wihbey that they had no search warrant, but would get one if needed; he asked Wihbey to show the agents where he had marijuana and guns. Wihbey agreed, and during the ensuing search the agents found 1200 grams of marijuana (about 2.7 pounds, which McDonough characterized as "personal use" marijuana) and some marijuana paraphernalia. Agent McDonough sought Wihbey's cooperation, asking him to name his source. Wihbey said that he would not give McDonough the name of the "guy above me" because he was a personal friend, but he would give the name of the "guy above him." Agent McDonough declined Wihbey's offer of partial cooperation. 2. Analysis ________ The Constitution requires that police normally obtain a warrant before entering a person's home to make an arrest. Payton v. New York, 445 U.S. 573, 590 (1980). The ______ ________ government says, however, that in this case "exigent circumstances" excused the warrantless entry. In determining whether an exigency justifies a warrantless search and seizure, the test is "whether there is such a compelling necessity for immediate action as will not brook the delay of obtaining a warrant." United States v. Wilson, 36 F.3d 205, _____________ ______ -8- 8 209 (1st Cir. 1994) (quoting United States v. Adams, 621 F.2d _____________ _____ 41, 44 (1st Cir. 1980)). Exigency determinations are generally fact-intensive and thus must be made on a case-by- case basis. See United States v. Donlin, 982 F.2d 31, 34 ___ _____________ ______ (1st Cir. 1992), in our past holdings, exigent circumstances have commonly included: (1) "hot pursuit" of a felon; (2) threatened destruction of evidence; (3) risk that the suspect may flee undetected; and (4) danger to the safety of the public or the police. See United States v. Tibolt, No. 94- ___ _____________ ______ 2221, slip op. at 8 (1st Cir. Dec. 29, 1995). Exigency must be assessed in light of the totality of the circumstances. United States v. Veillette, 778 F.2d 899, 902 (1st Cir. ______________ _________ 1985), cert. denied, 476 U.S. 1115 (1986). _____ ______ We defer to the district court's findings of the underlying facts unless clearly erroneous, but we afford plenary review to the district court's legal analysis and ultimate conclusion. Tibolt, slip op. at 8-9; United States ______ _____________ v. Curzi, 867 F.2d 36, 42 (1st Cir. 1989). We find clear _____ error only if, after reviewing all the evidence, we are left with "the definite and firm conviction that a mistake had been committed." United States v. Rust, 976 F.2d 55, 57 (1st _____________ ____ Cir. 1992). The magistrate judge who conducted the suppression hearing characterized this as a "borderline case," but nonetheless denied the motion to suppress. The magistrate -9- 9 judge found that Wihbey had consented to a search of his condominium after he had been arrested. Thus the critical issue was whether the entry to arrest was justified by exigent circumstances. The magistrate judge determined that circumstances were exigent based upon the following five "factors." First, it was reasonable for the DEA agents to choose not to prepare part or all of a warrant on the day before the arrest, as they did not know whom they were to arrest or, with requisite particularity, where the arrestee lived. Second, it would have taken "substantially more than two hours" to obtain a warrant at the relevant time, Saturday morning or early afternoon. Third, it was reasonable for agent McDonough to bring Britt, Rohan, and Weiner to DEA headquarters for further debriefing before seeking a warrant or taking other action. Fourth, it was reasonable for the agents to conclude that there was a compelling necessity for immediate action, based on the likelihood that Wihbey would grow suspicious of the delay in Weiner's return, causing Wihbey to flee or conceal or destroy evidence. Fifth, the DEA agents' plans for a second controlled buy from Camyre and Whitman later that afternoon did not precipitate the decision to arrest Wihbey without a warrant. Wihbey objected to the magistrate judge's report and recommendation, but the district court adopted the report and denied the motion to suppress. -10- 10 Before reviewing the ruling below, we narrow the issues because Wihbey has forfeited some of his Fourth Amendment arguments by failing to press his objections below.1 Wihbey's challenge to the suppression ruling is therefore limited to those issues that he specifically raised in his objection to the magistrate judge's report and recommendation. We ignore Wihbey's attempt to "generally object" to the magistrate judge's report, as well as his attempt to incorporate by reference the arguments made in his pre-hearing memorandum. Wihbey made two objections with sufficient specificity: (1) the magistrate judge erred in determining that it was reasonable for the agents to delay preparing for a warrant application until Saturday morning when they learned Wihbey's name and address, and (2) the magistrate judge erred in determining that there was a compelling necessity for immediate action, because the exigency was created by the agents' investigative strategy. We note that Wihbey did not object to any of the magistrate judge's proposed findings of the underlying facts, but only  ____________________ 1. Rule 3(b) of the Rules for United States Magistrates in the United States District Court for the District of Massachusetts requires a party who objects to a magistrate judge's findings and recommendations to identify specifically the objectionable portions of the proposed findings and recommendations and to state the basis for objection. The magistrate judge's report contained a clear warning about this rule, advising Wihbey that failure to comply would preclude appellate review, citing United States v. Valencia- _____________ _________ Copete, 792 F.2d 4, 6 (1st Cir. 1986) (approving such a local ______ rule). See also 28 U.S.C. 636(b)(1). ___ ____ -11- 11 to the reasonableness of the agents' actions and whether the facts constituted exigent circumstances. In particular, Wihbey did not object to the finding that Wihbey consented to the search after he was arrested; thus the issue before us is whether the warrantless arrest was justified by exigent circumstances. In any event, we find no error, let alone clear error, in the magistrate judge's findings as to the underlying facts. As to the forfeited arguments that Wihbey now raises, we find that none of the asserted errors rises to the level of plain error which might justify reversal. See ___ United States v. Olano, 113 S. Ct. 1770, 1776-1779 (1993). _____________ _____ a. Should the agents have started a warrant _________________________________________ application earlier? ____________________ Contrary to his assertion on appeal, Wihbey's right to be free from unreasonable searches and seizures did not impose a duty on the investigating agents to begin preparing for a warrant prior to the arrest and interrogation of Weiner, Britt, and Rohan on Saturday morning. The DEA agents did not learn Wihbey's name or which condominium unit he lived in until Saturday morning. Moreover, prior to Weiner's arrest, the agents could not be sure whether Wihbey would be at his condo or some other place, nor was there any assurance that the suspects to be arrested would cooperate and provide that crucial information. The DEA agents were not obligated to prepare a warrant application in advance merely because it -12- 12 might have been foreseeable that the contemplated arrest of Britt and Rohan would lead the agents to the source of the marijuana. See United States v. Cresta, 825 F.2d 538, 553 ___ _____________ ______ (1st Cir. 1987) ("Although probable cause existed some time prior to the arrests, this does not negate the rise of exigent factors."; "Unforeseeability has never been recognized as an element of the exigent circumstances exception . . . ."), cert. denied, 486 U.S. 1042 (1988). We _____ ______ therefore reject Wihbey's first basis for objection. b. Were the circumstances exigent? ______________________________ The magistrate judge credited agent McDonough's statement that he had doubts about the credibility of Britt, Rohan, and Weiner, and that it was reasonable to interview them in further detail before proceeding against Wihbey. Therefore, it was only sometime after 11:30 a.m., about three hours after the marijuana buy had begun, that McDonough faced the crucial decision whether he had time to obtain a warrant. The magistrate judge also relied on McDonough's testimony in finding that (1) it would take substantially longer than two hours to obtain a warrant and (2) that McDonough's decision to forego a warrant was not motivated by his desire to press ahead with the investigation of Whitman and Camyre. Wihbey did not specifically object to those recommended findings, and even if he had, those findings are not clearly erroneous in light of all the circumstances. Because of the delay in -13- 13 Weiner's return to Wihbey, and Weiner's statement that Wihbey would be growing suspicious, we agree with the magistrate judge and the district court that the agents reasonably feared that Wihbey would flee, or conceal or destroy marijuana evidence before a warrant could be obtained. It is well established that government agents must act reasonably, based on the objective facts available, when deciding that a warrantless entry is justified: "Whether the basis for such authority exists is the sort of recurring factual question to which law enforcement officials must be expected to apply their judgment; and all the Fourth Amendment requires is that they answer it reasonably." Illinois v. Rodriguez, 497 U.S. 177, 186 (1990). We agree ________ _________ with the magistrate judge and the district court that it was reasonable for the agents in this case to judge the circumstances exigent and to take action accordingly. Although he did not raise the argument below, Wihbey now argues that his suspicion could have been allayed -- and the exigency averted -- by a phone call from Weiner assuring him that all was well. While that may be true, it does not alter our conclusion. It was well within the reasonable professional judgment of the agents to choose not to jeopardize a continuing investigation by taking measures, such as a phone call, that might (or might not) alleviate the exigency. The telephone call might have had the opposite -14- 14 effect, heightening Wihbey's suspicion, and inducing him to immediately flee, or destroy or conceal evidence. We also reject Wihbey's argument that the exigency was created by the DEA agents' investigative strategy. The need for quick action arose upon the agents' determination that arrestees Rohan, Britt, and Weiner had provided reliable information about Wihbey and that he would be suspicious because of any further delay in getting back to him. We accept the magistrate judge's finding that the timing of the second controlled buy did not drive the agents' decision to forego a warrant. And, as we have said, the agents had no duty to prepare a warrant application before the arrest of Rohan and Weiner nor to attempt to allay Wihbey's suspicion with a phone call. Wihbey argues that the agents could have established surveillance of his condominium, without entry, to prevent Wihbey's flight, but that would not have prevented the destruction of evidence within. We see nothing about the agent's investigative strategy that created the exigency. This is not a situation where the agents deliberately created the exigent circumstances. The agents had no choice but to respond promptly once they learned that Wihbey was at his condominium, undoubtedly growing suspicious as he awaited the overdue proceeds of the busted transaction. See United ___ ______ States v. Cresta, 825 F.2d at 553. ______ ______ -15- 15 For the foregoing reasons, we affirm the denial of Wihbey's motion to suppress. -16- 16 B. Improper Arguments by the Prosecutor B. Improper Arguments by the Prosecutor ________________________________________ Wihbey and Whitman seek a new trial because, they claim, the prosecutor in closing argument commented upon their failure to testify, shifted the burden of proof to them, and vouched for the government's witnesses. 1. Comment on Failure to Testify and Attempt to ______________________________________________ Shift the Burden of Proof _________________________ Wihbey and Whitman contend that the following remark (hereafter "Comment One"), made during the government's summation, was an improper comment on their failure to testify: What I would like to do, however, is talk to you for a few minutes about the three specific charges that are contained in the indictment . . . .  The first one, and I would suggest to you the most important one, is the conspiracy count and that conspiracy count lists, as you know, six different persons -- four of them you heard from -- Mr. Britt, Mr. Rohan, Mr. Weiner, Mr. Wihbey and Mr. Whitman and Mr. Camyre. You've heard from all of those witnesses _________________________________________ except for obviously the two Defendants _________________________________________ who have now been charged. __________________________ (emphasis added).  Wihbey asserts that a second remark ("Comment Two") was also an improper comment on his failure to testify as well as an attempt to shift the burden of proof to him. The prosecutor recounted Wihbey's post-arrest statement to DEA special agent McDonough that Wihbey would not turn in his -17- 17 source because he was Wihbey's friend, but that he would give the name of the friend's source. Then the prosecutor said: Now, if Mr. St. Clair [Wihbey's lawyer] can stand up and explain away _ that conversation to you, then you should let Bob Wihbey walk out of here with a verdict of acquittal. But he can't do that, ladies and gentlemen, because that is not a conversation that an innocent man, who's been falsely accused, would have under those circumstances. There's just no other explanation except the one that's been provided from the witness stand by the eight witnesses called by the government. (emphasis added).  At the end of the prosecutor's summation, during which the prosecutor made Comments One and Two, Wihbey's lawyer asked to approach the bench, but the trial judge ordered him instead to "move on with it for now." Wihbey's lawyer therefore proceeded with his closing argument; Whitman's lawyer followed. After the prosecutor's rebuttal, Wihbey and Whitman both moved for a mistrial, citing Comment One as an improper comment on their failure to testify, and citing as improper a third comment. We assume arguendo that ________ defense counsel's attempt to approach, coupled with specific mention in the mistrial motion, was a sufficient objection to Comment One to preserve the issue for appeal. We consider Wihbey's failure to mention Comment Two in the motion for mistrial, however, as a failure to object; therefore if there was an error in Comment Two, the error was forfeited and is -18- 18 reviewed for plain error only. See Olano, 113 S. Ct. at ___ _____ 1776-1779. Comment by a prosecutor on a defendant's failure to testify violates the Fifth Amendment guarantee against self- incrimination. Griffin v. California, 380 U.S. 609, 615 _______ __________ (1965). A court determines if a prosecutor's remarks violate Griffin by asking "whether, in the circumstances of the _______ particular case, the language used was manifestly intended or was of such a character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify." United States v. Akinola, 985 F.2d ______________ _______ 1105, 1111 (1st Cir. 1993) (quoting United States v. Glantz, _____________ ______ 810 F.2d 316, 322 (1st Cir.), cert. denied, 482 U.S. 929 _____ ______ (1987)). If we find that a prosecutor has violated Griffin, _______ we then review for harmless error. United States v. Hasting, _____________ _______ 461 U.S. 499, 508-12 (1983) (applying the constitutional harmless error analysis established in Chapman v. California, _______ __________ 386 U.S. 18, 24 (1967)). In Chapman, the Supreme Court _______ stated that a prosecutorial comment on the failure of the accused to testify would not require reversal if the State could show "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." 386 U.S. at 24. The Supreme Court clarified the Chapman _______ constitutional harmless error standard in Sullivan v. ________ Louisiana, 113 S. Ct. 2078, 2081 (1993), explaining that the _________ -19- 19 inquiry is "not whether, in a trial that occurred without error, a guilty verdict surely would have been rendered, but whether the guilty verdict actually rendered in this trial ____ was surely unattributable to the error." (emphasis in original). A very different standard is applied when a party forfeits an error by failing to make a contemporaneous objection, as Wihbey did with respect to Comment Two. In that case, we have the discretion to reverse only for "plain error," i.e., error that is "clear" and "obvious" and that was "prejudicial" to the defendant in that it "affected the outcome of the District Court proceedings."2 Olano, 113 S. _____ Ct. at 1777-78. And, we exercise that discretion only if the plain forfeited error seriously affects the fairness, integrity, or public reputation of judicial proceedings; an example of such an error is one that causes the conviction of an actually innocent defendant. Id. at 1779. ___ As to Comment One, we find, first, that the prosecutor did not "manifestly intend" to comment on the defendants' failure to testify. See Akinola, 985 F.2d at ___ _______  ____________________ 2. After stating that a forfeited error was prejudicial if it affected the outcome of the proceedings, the Supreme Court in Olano stated: "There may be a special category of _____ forfeited errors that can be corrected regardless of their effect on the outcome . . . ." The Court also adverted, without specificity, to a class of errors "that should be presumed prejudicial if the defendant cannot make a specific showing of prejudice." 113 S. Ct. at 1778.  -20- 20 1111. The context of the comment indicates that the prosecutor intended to list the six persons charged in the conspiracy count and to remind the jury that they had heard from four of the six. But, apparently by mistake, he named Wihbey and Whitman among those who testified. The challenged comment appears to be an unartful attempt to correct that mistake, by reminding the jury that "of course" the defendants did not testify. Second, based on the context, we find that the jury would not "naturally and necessarily take [the remark] to be a comment on the failure of the accused to testify." See id. We think it likely that the jury took the ___ ___ comment the same way we do, as an attempt to clarify a slip of the tongue. By saying "of course [the defendants did not testify]," the prosecutor just as plausibly has reminded the jury that the defendants' silence was to be expected, i.e., that it is natural for a defendant to exercise his Fifth Amendment right. The remark does not necessarily imply that the jury should draw any negative inference from the failure to testify. "A court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations." United States v. Lilly, 983 F.2d ______________ _____ 300, 307 (1st Cir. 1992) (quoting Donnelly v. DeChristoforo, ________ _____________ -21- 21 416 U.S. 637, 647 (1974)). Accordingly, we hold that Comment One was not a Griffin violation. _______ In contrast to Comment One, we find Comment Two to be effectively a comment on Wihbey's failure to testify, and that the jury likely understood it that way. Also, the comment impermissibly suggested that Wihbey bore the burden of proof. See United States v. Skandier, 758 F.2d 43, 45-46 ___ _____________ ________ (1st Cir. 1985) (holding that a "how-does-counsel-explain" argument is a Griffin violation and an impermissible shift of _______ burden of proof). Wihbey, however, forfeited this error by failing to object or raise it as grounds for mistrial.3 Although it was improper, Comment Two does not rise to the level of "plain error" under the Olano standard. 113 S. Ct. _____ at 1776-79. In light of all the circumstances, we do not believe that the comment affected the outcome or "seriously affected the fairness, integrity, or public reputation of judicial proceedings."4 Id. at 1779. First, the judge gave ___  ____________________ 3. We recognize that, after the prosecutor's summation, Wihbey's lawyer asked "Your honor, may I approach sidebar?" We must assume he intended to object to the prosecutor's remarks. The judge told counsel to move on with his closing argument. Upon being rebuffed, counsel did not state an objection or press further the request to approach. In any event, counsel had the opportunity to raise Comment Two as grounds for mistrial, but specified only Comments One (and Comment Three, which we discuss further on). 4. This improper remark by the prosecutor is not in the class of forfeited errors adverted to in Olano, 113 S. Ct. at _____ 1778, which are presumed to be prejudicial without regard to -22- 22 a strong instruction on the defendants' right not to testify and the government's burden of proof.5 Second, there was  ____________________ their affect on the outcome. Indeed, if Wihbey had objected and preserved the error, it would be subject to harmless error review, which of course focuses on the effect of the error on the outcome. See United States v. Hasting, 461 U.S. ___ _____________ _______ 499, 508-12 (1983). 5. The relevant portions of the jury instruction follow: The law presumes a defendant to be innocent of a crime. Thus, a defendant, although accused, begins the trial with a clean slate, with no evidence against him. . . . . The presumption of innocence alone is sufficient to acquit a defendant . . . . . . . . The burden is always upon the prosecution to prove guilt beyond a reasonable doubt. Now I told you two or three times during this trial that the Defendants have a constitutional right not to testify or offer any evidence on their behalf. If any counsel stated during final argument that the Defendant did not testify in an attempt to impugn that's wrong and something might be wrong with them, I urge you now to completely ignore it and disregard it. The law is clear a defendant never has the burden of proving his innocence, for the law never imposes upon a defendant in a criminal case the burden or duty of calling any witnesses or producing any evidence. The Government has the burden of proving to you beyond a reasonable doubt that the Defendants are guilty of the crimes charged. This burden of proof rests upon the Government and it never shifts to the Defendants. . . . . As I told you, the Government has the burden of proving guilt of the Defendant beyond a reasonable doubt. -23- 23 significant (but admittedly not overwhelming) evidence of Wihbey's guilt, enough that we find it unlikely that any negative inference drawn from his failure to testify tipped the scale from "not guilty" to "guilty." The evidence against Wihbey included co-conspirator testimony, police surveillance of pre-transaction marijuana sampling at Wihbey's condo complex, Wihbey's ownership of the house where the forty-pound transaction took place, marijuana and paraphernalia seized from Wihbey's condo, and Wihbey's incriminating post-arrest statement. Given the curative instruction and the evidence of guilt, we are not convinced that the improper remark constituted plain error.  2. Witness Vouching ________________ Wihbey and Whitman contend that the prosecutor, in his rebuttal, improperly vouched for the accomplice witnesses who testified under their plea agreements. The prosecutor  ____________________ That burden remains with the Government throughout the entire trial and never shifts to the Defendant.  Accordingly, if either of the Defendants has not testified in this case, and neither have testified in this case, you are not to attach any significance to this fact, and you may not in any way consider this against eitheroftheDefendantsinyourdeliberations. . . . . And further, you should bear in mind that the law never imposes upon a defendant in a criminal case the burden or duty of calling any witnesses or producing any evidence. -24- 24 analogized the trial evidence to a "mosaic" made up of many "tiles" that were individually imperfect if closely scrutinized, but which nonetheless would give a clear picture if viewed as a whole. After making that analogy, the prosecutor made the challenged comment ("Comment Three"): None of these witnesses are perfect. None of them have perfect memories.  But what they have done is testified ________________________________ to you truthfully about what they knew, _________________________________________ and despite the fact that there are some imperfections in their testimony, if you take a step back from that individual tile, you will see that the Britt tile [government witness] and the Rohan [government witness] tile go hand in hand. (emphasis added). There was no immediate objection. But two sentences later, the prosecutor ended his rebuttal, the judge excused the jury for lunch, and the defendants moved for a mistrial, arguing that this comment was improper witness vouching. The question is close whether the defendants have preserved the issue for appeal. Compare United States v. _______ ______________ Sepulveda, 15 F.3d 1161, 1186-87 (1st Cir. 1993) (where _________ defendant did not object or raise improper prosecutorial argument until motion for mistrial after conclusion of summations, error forfeited and reviewed for plain error only), cert. denied 114 S. Ct. 2714 (1994), with United _____ ______ ____ ______ States v. Mandelbaum, 803 F.2d 42, 43 (1st Cir. 1986) ______ __________ (objection made after closing arguments was timely enough to preserve error for appeal, although it "should have been made -25- 25 earlier) and United States v. Levy-Cordero, 67 F.3d 1002, ___ ______________ ____________ 1008 n.6 (1st Cir. 1995) (objection after arguments sufficient to preserve issue for appeal where parties had agreed not to object during arguments). For the sake of argument, we will treat the issue as preserved for appeal as if a contemporaneous objection had been lodged. An improper argument to the jury that does not implicate a defendant's constitutional rights, such as the witness vouching that occurred here, constitutes reversible error only where the prosecutor's remarks were both inappropriate and harmful. See id. at 1008. Improper ___ ___ statements during closing argument are considered harmful if, given the totality of the circumstances, they are likely to have affected the trial's outcome.6 Id. (citing United ___ ______  ____________________ 6. Prosecutorial arguments that implicate a constitutional right of the accused are reviewed under a higher standard than arguments that are improper, but not unconstitutional. See Steven A Childress and Martha S. Davis, Federal Standards ___ _________________ of Review 11.23 (2d ed. 1992). We have repeatedly held _________ that an "inappropriate" comment is not a reversible error unless it is likely to have affected the outcome of the trial. See, e.g., United States v. Cartagena-Carrasquillo, ___ ____ _____________ ______________________ 70 F.3d 706, 713 (1st Cir. 1995); United States v. Levy- _____________ _____ Cordero, 67 F.3d 1002, 1008 (1st Cir. 1995); United States v. _______ _____________ Ovalle-M rquez, 36 F.3d 212, 220 (1st Cir. 1994), cert. ______________ _____ denied, 115 S. Ct. 947 (1995); United States v. Manning, 23 ______ _____________ _______ F.3d 570, 574 (1st Cir. 1994). The Supreme Court, however, has held that a comment on the failure of the accused to testify is a constitutional violation, without inquiry as to its affect on the outcome. Griffin v. California, 380 U.S. 609, 615 (1965). Indeed, a _______ __________ Griffin comment is a reversible error unless the government _______ __________ can persuade the appellate court that it was harmless, i.e., ________ did not affect the outcome. See United States v. Hasting, ___ ___ ______________ _______ 461 U.S. 499, 507-09 (1982); Chapman v. California, 386 U.S. _______ __________ -26- 26 States v. Manning, 23 F.3d 570, 574 (1st Cir. 1994)). In ______ _______ making that determination, we focus on (1) the severity of the prosecutor's misconduct, including whether it was deliberate or accidental; (2) the context in which the misconduct occurred; (3) whether the judge gave curative instructions and the likely effect of such instructions; and (4) the strength of the evidence against the defendants. Id. ___ Although the prosecutor's statement that "what they have done is testify truthfully" was inappropriate, our consideration of these factors leads us to conclude that it was not harmful. First, the witness vouching here was not, on balance, severe. The prosecutor did not express his personal opinion about the witnesses' veracity, see United ___ ______ States v. Mejia-Lozano, 829 F.2d 268, 273 (1st Cir. 1987); ______ ____________  ____________________ 18, 26 (1967). It appears that this court has on occasion treated Griffin comments like other improper comments, affirming _______ convictions where the panel found it unlikely that the comments affected the outcome. See, e.g., United States v. ___ ____ _____________ Glantz, 810 F.2d 316, 320 (1st Cir.), cert. denied, 482 U.S. ______ _____ ______ 929 (1987); United States v. Cox, 752 F.2d 741, 744 (1st Cir. _____________ ___ 1985). These cases may overstate the defendant's burden in demonstrating a Griffin violation.  _______ It is clear that a comment on the failure of the accused to testify is a constitutional error, and the burden rests with the government to show the error harmless beyond a reasonable doubt, not with the defendant to show the comment was harmful. See, e.g., Hasting, 461 U.S. at 507-09; ___ ____ _______ Chapman, 386 U.S. at 26. _______ On the other hand, in cases where defendants have challenged non-constitutional inappropriate comments, the burden rests with the defendant to show that the comment was harmful, i.e., that "under the totality of the circumstances they affected the trial's outcome." See Cartagena- ___ __________ Carrasquillo, 70 F.3d at 713; Levy-Cordero, 67 F.3d at 1008. ____________ ____________ -27- 27 nor did the prosecutor suggest that he had special knowledge about the witnesses' credibility, or that special circumstances such as an oath or a plea agreement ensured the witnesses' honesty, see Manning, 23 F.3d at 572, 575. The ___ _______ purpose of the "mosaic" analogy and the vouching comment was to concede the existence of imperfections and inconsistencies in the accomplices' testimony, and to argue that those inconsistencies did not indicate dishonesty or fabrication. Although the witness vouching seems to have been intentional, in that it was part of a clearly planned oration, it was fairly mild and barely crossed the line of impropriety. See ___ United States v. Oreto, 37 F.3d 739, 746 (1st Cir. 1994) ______________ _____ (prosecutor's argument that "nobody lied" was "mild vouching, essentially harmless"), cert. denied, 115 S. Ct. 1161 (1995); _____ ______ United States v. Innamorati, 996 F.2d 456, 483 (1st Cir.) _____________ __________ (stating that the line between proper argument that a witness is credible and improper vouching is "often hazy"), cert. _____ denied, 114 S. Ct. 409 (1993). The context in which the ______ vouching occurred has aspects that suggest harmfulness, and aspects that cut the other way. On the one hand, the final lines of the prosecutor's rebuttal are thought to leave a lasting impression on the jury. See Manning, 23 F.3d at 575. ___ _______ On the other hand, the vouching was to some extent a fair response to the thrust of the defense summation, which emphasized that the accomplices were liars and that they were -28- 28 exaggerating, coloring their testimony, and telling the government what they wanted to hear. See Mejia-Lozano, 829 ___ ____________ F.2d at 268, 274 (prosecutor given "greater leeway" where vouching was "in response to defense counsel's inflammatory statements"). The judge gave a strong and specific curative instruction. Statements and arguments of counsel are not evidence in the case . . . .  If any attorney in the case in closing arguments stated to you that my clients or my witnesses told the truth, ignore it. It's what you determine from the witnesses and the evidence in the case, from the point of view of deciding facts, that will control the credibility of all witnesses; it will be for you and only for you to determine. Although the curative instruction was not contemporaneous, the defendants did not object to the witness vouching until after the prosecutor finished his rebuttal and the jury was excused for lunch. The earliest opportunity for the judge to give a curative instruction was during the final charge. We normally presume that a jury will follow an instruction to disregard inadmissible evidence or an improper argument. See ___ Greer v. Miller, 483 U.S. 756, 766 n.8 (1987). We find it _____ ______ likely that this forceful instruction effectively neutralized the vouching that occurred here. Finally, the evidence against Wihbey and Whitman was sufficiently strong for us to conclude, after considering -29- 29 the totality of circumstances, that the vouching was unlikely to affect the outcome of the trial. As noted in our earlier analysis of Comment Two, the evidence against Wihbey was substantial. The evidence against Whitman was even stronger; it included the testimony of his accomplices Britt, Rohan, Camyre, and Brandt, pre-arrest tape recorded conversations where Whitman's accomplices explicitly discussed Whitman's role in the marijuana distribution plans, and testimony by DEA agents about Whitman's post-arrest cooperation and statements that made his role in a planned marijuana transaction rather clear. We therefore conclude that the vouching in this case did not constitute reversible error. 3. Motions for Mistrial and New Trial __________________________________ We recognize that several incidents of prosecutorial misconduct, none of which would separately constitute grounds for mistrial, could have a cumulative impact on the jury sufficient to affect the trial's outcome. We review a trial judge's ruling on a motion for a mistrial, or for a new trial, only for abuse of discretion. United ______ States v. Barbioni, 62 F.3d 5, 7 (1st Cir. 1995) (motion for ______ ________ mistrial); Glantz, 810 F.2d at 320 & n.2 (motion for new ______ trial because of improper argument). Although the Assistant United States Attorney in this case exceeded the permissible limits of proper argument, we cannot say that his action was deliberate and we do not believe that the closing arguments, -30- 30 viewed collectively, affected the outcome or the fairness of this trial. For the reasons set forth in our review of the challenged comments, we hold that the trial judge did not abuse his discretion in denying the defendants' motions for a mistrial and for a new trial. -31- 31 C. Single Conspiracy vs. Multiple Conspiracies C. Single Conspiracy vs. Multiple Conspiracies _______________________________________________ The jury convicted both Wihbey and Whitman under Count I of the indictment, which charged a single marijuana distribution conspiracy among six persons (the two defendants along with Britt, Rohan, Weiner, and Camyre). Wihbey and Whitman argue that the evidence was insufficient to allow the jury to find a single conspiracy, and that the evidence showed instead two separate conspiracies. The framework for analyzing when a variance between the conspiracy charged and the conspiracy proven constitutes reversible error was set forth in United States v. Glenn: _____________ _____ (1) Is the evidence sufficient to permit a jury to find the (express or tacit) agreement that the indictment charges? (2) If not, is it sufficient to permit a jury, under a proper set of instructions, to convict the defendant of a related, similar conspiracy? (3) If so [i.e., the answer to (2) is yes], does the variance affect the defendant's substantial rights or does the difference between the charged conspiracy and the conspiracy proved amount to "harmless error?" 828 F.2d 855, 858 (1st Cir. 1987). Put differently, "[s]o long as the statutory violation remains the same, the jury can convict even if the facts are somewhat different than charged -- so long as the difference does not cause unfair prejudice." United States v. Twitty, No. 95-1056, slip op. _____________ ______ at 3 (1st Cir. Dec. 28, 1995) (citing Glenn, 828 F.2d at _____ 858).  -32- 32 This court has recognized at least three ways in which such a variance might "affect the substantial rights" of the accused. United States v. Sutherland, 929 F.2d 765, _____________ __________ 772-73 (1st Cir.), cert. denied, 503 U.S. 822 (1991). First, _____ ______ a defendant may receive inadequate notice of the charge against him and thus be taken by surprise at trial. Id. ___ Second, a defendant may be twice subject to prosecution for the same offense. Id. Third, a defendant may be prejudiced ___ by "evidentiary spillover": the "transference of guilt" to a defendant involved in one conspiracy from evidence incriminating defendants in another conspiracy in which the particular defendant was not involved. Id.  ___ The question whether a given body of evidence is indicative of a single conspiracy, multiple conspiracies, or no conspiracy at all is ordinarily a matter of fact; a jury's determination in that regard is subject to review only for evidentiary sufficiency. United States v. David, 940 F.2d ______________ _____ 722, 732 (1st Cir.), cert. denied, 502 U.S. 989 (1991), et _____ ______ __ al.. In reviewing the sufficiency of the evidence, we take ___ the evidence in the light most favorable to the verdict. Id. ___ at 730. We review de novo the question whether a variance __ ____ affected a defendant's substantial rights. United States v. _____________ Arcadipane, 41 F.3d 1, 6 (1st Cir. 1994). __________ Wihbey and Whitman assert that the evidence was insufficient "to demonstrate that all of the alleged co- -33- 33 conspirators directed their efforts towards the accomplishment of a common goal or overall plan." United ______ States v. Drougas, 748 F.2d 8, 17 (1st Cir. 1984). But we ______ _______ find it unnecessary to engage in that factual inquiry; we shall assume for the sake of argument that the evidence was insufficient to convict either Wihbey or Whitman of the charged single conspiracy, satisfying the first part of the tripartite Glenn framework. See 828 F.2d at 858. Wihbey and _____ ___ Whitman properly concede, however, that the evidence was sufficient to prove that each participated in a related similar, but smaller, conspiracy, and their arguments jump directly from the first prong to the third (prejudice) prong. Specifically, they concede that the evidence was sufficient for a rational juror to find agreements to traffic in marijuana among (1) Wihbey, Weiner, and Rohan,7 and (2) Whitman, Camyre, Britt, and Rohan. Thus, the second prong of Glenn is satisfied. See id. Wihbey and Whitman argue, _____ ___ ___ however, for a new trial because the variance between the single conspiracy charged and the multiple conspiracies proven was prejudicial to them because of evidentiary spillover. We therefore proceed to Glenn's third prong, _____ making two assumptions. We assume first that the evidence  ____________________ 7. Although Britt was arrested along with Weiner and Rohan during the Wihbey-supplied transaction at Wihbey's Arden Street house, Britt is not included in this first group because we are assuming arguendo that there were two separate ________ conspiracies.  -34- 34 was insufficient to prove the single conspiracy charged, and second, as the defendants concede and as ample evidence supports, that there were two separate conspiracies: (1) Wihbey agreeing to sell 250 pounds of marijuana to Rohan, with Weiner acting as Wihbey's agent, and (2) Whitman and Camyre agreeing to sell Britt and Rohan thirty-seven pounds of marijuana obtained from Brandt. Even if the assumed variance existed between the conspiracy charged and the proof at trial, it did not prejudice either Wihbey or Whitman, and it was therefore harmless under the Glenn framework. See _____ ___ Glenn, 828 F.2d at 858. We explain. _____ Wihbey and Whitman argue that the variance was prejudicial because there was "an improper imputation of guilt" to each of them from the other's conspiracy. After reviewing the trial record, we reject the claim of prejudicial evidentiary spillover for the following reasons. First, the defendants' briefs cite only two specific instances of evidentiary spillover. One instance is Britt's testimony that Rohan said he had a friend (implicitly Wihbey) who could supply 250 pounds of marijuana. But Rohan's statements about Wihbey do not spill over from another conspiracy in which Wihbey did not take part; on the contrary, the evidence clearly showed that Wihbey conspired with Rohan. Therefore, Britt's testimony as to Rohan's out- -35- 35 of-court statement was admissible against Wihbey as a co- conspirator statement under Federal Rule of Evidence 801(d)(2)(E), thus there was no "spillover" to Wihbey. And as to Whitman, Rohan's statement is probative of the agreement between Britt and Rohan and thus relevant to proving the conspiracy between Britt, Rohan, Whitman, and Camyre. The testimony was not "spillover" because the evidence clearly showed that Whitman and Rohan were co- conspirators, rendering the statement admissible against Whitman under Fed. R. Evid. 801(d)(2)(E). Thus, as to both Wihbey and Whitman, the cited statement by Rohan was relevant and independently admissible without regard to the existence of the larger conspiracy (which we are assuming arguendo was ________ not proven). See United States v. O'Bryant, 998 F.2d 21, 26 ___ _____________ ________ (1st Cir. 1993) (no spillover where evidence was relevant and independently admissible). The other cited instance of evidentiary spillover was Britt's testimony that he and Rohan were "going to do a separate deal" together (implicitly with Wihbey). That statement might be fairly characterized as spillover as to Wihbey, given our assumption that the evidence was insufficient to tie Britt to the Wihbey-Rohan-Weiner conspiracy. But, even if Wihbey had been given a separate trial, the jury would have properly heard testimony about the arrest of Britt and Rohan while buying marijuana from Wiener -36- 36 in Wihbey's Arden Street house. Thus, it is hard to see how there could be any marginal probative value in Britt's statement that he and Rohan had planned to do that deal together. And, once again, this testimony is not spillover as to Whitman, against whom it would be relevant and independently admissible, because the evidence showed that Britt, Rohan, and Whitman were co-conspirators. Thus, the defendants have identified only one specific instance of evidentiary spillover, which we find harmless, and we will not hypothesize the existence of other instances. Second, the trial judge gave a jury instruction that cautioned against using spillover evidence:8  In reaching your verdict, keep in mind that guilt is both personal and individual. Your verdict must be based solely upon the evidence presented about each Defendant. The case against each Defendant stands or falls upon the proof or lack of proof against that Defendant alone. Your verdict as to one Defendant should not influence your decision as to the other Defendant. The trial judge gave similar instructions again when charging the jury on the elements of conspiracy and what evidence they  ____________________ 8. The judge also gave a multiple conspiracy instruction, to the effect that the jury must acquit both defendants if it found that the single conspiracy charged did not exist, even if it found other conspiracies. Thus, the jury verdict can be seen as an effective rejection of the multiple conspiracy theory. See United States v. Sepulveda, 15 F.3d 1161, 1191 ___ ______________ _________ (1st Cir. 1993), cert. denied, 114 S. Ct. 2714 (1994). _____ ______ However, we have assumed for the sake of analysis that the evidence was insufficient to support that verdict, and we have momentarily embraced the multiple conspiracy theory. -37- 37 could consider as proof of a conspiracy. These instructions were aimed at preventing evidentiary spillover, and we do not readily assume that a jury disregards clear directions. Greer, 483 U.S. at 766 n.8. The defendants did not request _____ any other instruction as to spillover, nor did they object to this one. Third, Wihbey's activities (and the evidence thereof) were quite distinct from Whitman's; each separately agreed to supply marijuana to a middleman (Rohan, at least, and perhaps Britt) for resale to the informant DeCastro. The question here is whether evidence about Wihbey and his conspiracy spilled over to prejudice Whitman, or vice versa. Assuming, as we are, two separate conspiracies, with the Wihbey sale distinct from the Whitman sale, the defendants have not explained how the jury could have found evidence from one conspiracy to be particularly probative of the other conspiracy. See United States v. Dworken, 855 F.2d 12, 24 ___ _____________ _______ n.24 (1st Cir. 1988) (evidence from separate conspiracies unlikely to have spillover effect). We see little about the fact that one of the defendants agreed to sell to Rohan that makes it more likely that the other defendant also agreed to sell to Rohan. All we are left with is the possibility that some general, non-specific transference of guilt must have occurred. The appellants have not pressed that argument, and in any event we find such any such general transference of -38- 38 guilt in this case to be harmless under the totality of the circumstances.  Wihbey also asserts that the variance was prejudicial in that he was sentenced for the 250 pounds of marijuana he agreed to sell Rohan rather than the forty pounds actually delivered. We see no merit in that argument. Drug quantity is not considered by the jury an element of either the conspiracy or the possession count, but is rather a matter for the district court to consider at sentencing. See United States v. Campbell, 61 F.3d 976, 979-80 (1st Cir. ___ _____________ ________ 1995) (no specific quantity need be proven at trial; quantity typically relevant only at sentencing stage). Moreover, evidence of the 250 pound quantity was derived from the smaller conspiracy of which Wihbey was clearly part, thus his claim that his sentence was affected by the asserted variance and some associated evidentiary spillover is particularly difficult to fathom. "To prevail on a claim of prejudicial spillover, a defendant `must prove prejudice so pervasive that a miscarriage of justice looms.'" United States v. Levy- ______________ _____ Cordero, 67 F.3d 1002, 1008 (1st Cir. 1995) (quoting United _______ ______ States v. Pierro, 32 F.3d 611, 615 (1st Cir. 1994), cert. ______ ______ _____ denied, 115 S. Ct. 919 (1995)) (citations omitted). Because ______ Wihbey and Whitman have fallen far short of such a showing, we conclude that any variance between the single conspiracy -39- 39 charged and the conspiracy or conspiracies proven at trial was not prejudicial to the defendants and is not grounds for reversal. D. Sentencing Issues D. Sentencing Issues _____________________ Wihbey and Whitman both contend that the sentencing judge made erroneous factual findings material to their sentencing under the federal sentencing guidelines. For sentencing purposes, the government must prove drug quantities by a preponderance of the evidence. United States _____________ v. Sepulveda, 15 F.3d 1161, 1198 (1st Cir. 1993). We review _________ the sentencing court's factfinding for clear error, id. at ___ 1196, reversing only if, after reviewing all of the evidence, we are left with the definite and firm conviction that a mistake has been made. United States v. Rust, 976 F.2d 55, _____________ ____ 57 (1st Cir. 1992). 1. Wihbey's Sentence: Drug Quantity _________________________________ Wihbey asserts that the sentencing judge committed clear error in determining the drug quantity for guideline sentencing purposes. The commentary to the applicable guideline provides: In an offense involving negotiation to traffic in a controlled substance, the weight under negotiation in an uncompleted distribution shall be used to calculate the applicable amount. However, where the court finds that the defendant did not intend to produce and was not reasonably capable of producing the negotiated amount, the court shall exclude from the guideline calculation -40- 40 the amount that it finds the defendant did not intend to produce and was not reasonably capable of producing. United States Sentencing Commission, Guidelines Manual,  _________________ 2D1.1, comment. (n.12) (Nov. 1, 1994). The judge found the applicable quantity of marijuana to be 250 pounds, the amount Wihbey had agreed to sell to Rohan according to the testimony of Wihbey's co-conspirators. Wihbey points out that only forty pounds changed hands in the controlled buy and less than three more pounds were found later in Wihbey's condominium. As the guideline commentary suggests, we first examine the evidentiary basis for determining that 250 pounds was the negotiated amount, which as a general rule is the applicable quantity, and then we examine whether the exception to the general rule should have been applied. The sentencing judge presided at trial and heard and observed the testimony of all the witnesses, which we find sufficient to support his drug quantity finding under our deferential standard of review. Rohan testified that Wihbey agreed to sell 250 pounds in fifty-pound increments. Weiner also testified that the deal was "for something like 250 pounds." Rohan, Britt, and DeCastro discussed the 250- pound purchase in their tape-recorded conversation. Britt testified that Rohan said his source had 200 to 250 pounds available, and the deal would go forward in fifty-pound lots. -41- 41 Wihbey argues that the testimony of these cooperating co-conspirators was unreliable. Our observations in United States v. Zuleta-Alvarez are applicable here: _____________ ______________ In this case, there existed sufficient indicia of reliability to avoid reversal for clear error. First, the testimony . . . relied upon by the sentencing judge was all provided under oath . . . and was corroborated by the many witnesses who testified . . . . Moreover, the sentencing judge was also the presiding judge during the prior proceedings. Thus the sentencing judge had the opportunity to observe the testimony and cross- examination of the various witnesses and could thereby make an independent assessment of their credibility. 922 F.2d 33, 36-37 (1st Cir. 1990), cert. denied, 500 U.S. _____ ______ 927 (1991). Based on the testimony at trial, the judge's factual finding that the negotiated amount was 250 pounds was not clearly erroneous. In addition to challenging the evidentiary support for the finding that the negotiated amount was 250 pounds, Wihbey argues that there was insufficient evidence of his intention and capability to deliver that amount. But that argument misses the mark; it seems to be based on a misreading of the directive of commentary note 12 to 2D1.1 of the guidelines. We have interpreted application note 12 as directing that the amount of drugs under negotiation must be considered in determining the applicability of a minimum mandatory penalty unless the sentencing court supportably finds both ____ that the defendant did not intend to -42- 42 produce the additional quantity of narcotics, and that he lacked the ___ capacity to do so. United States v. Muniz, 49 F.3d 36, 42 (1st Cir. 1995) _____ (emphasis in original). In other words, as the plain language of the guideline comment dictates, the negotiated amount applies unless the sentencing judge makes a finding that the defendant lacked the intent and the capability to deliver. Wihbey argued at the disposition hearing that because only forty pounds were delivered and because he had no prior record of drug-dealing, he therefore lacked the capability and intent to deliver 250 pounds. But the sentencing judge rejected Wihbey's argument, and expressly found that Wihbey was capable of producing the 250 pounds; the judge did not state the basis for that finding, however. In our view, the co-conspirator testimony noted above about the 250-pound deal is somewhat probative of Wihbey's intent and capability to produce that amount. The fact that the DEA did not find the remaining marijuana in Wihbey's condominium does not prove that Wihbey was unable or did not intend to deliver; obviously, he may have arranged to have the drugs kept elsewhere, to be delivered to Arden Street as the deal progressed. Consistent with the clear language of note 12 to section 2D1.1 of the guidelines, the negotiated amount is the applicable quantity unless Wihbey can show both "no intent" -43- 43 and "no capacity" to produce that amount. The sentencing judge found that Wihbey failed to make that showing, and that finding was not clearly erroneous. 2. Whitman's Sentence: Leadership Role ____________________________________ Whitman urges that the sentencing judge committed clear error in finding that he had a leadership role over Camyre justifying an enhancement under U.S.S.G. 3B1.1(c). His argument is twofold: (1) the trial evidence was insufficient to support the leadership finding, and (2) Whitman's youth relative to Camyre and the other conspirators indicates that Whitman was at most a "co-equal," not a leader. The second argument is easily dismissed: although age often correlates with one's organizational status, common experience provides enough counterexamples to indicate that there is little probative value in that correlation. As to the first argument, the evidence in this case strongly suggests that Whitman did play a leadership role. The excerpts of Camyre's testimony cited in the government's brief show that Camyre responded to Whitman's orders, that Whitman set the timing of the planned transaction, and that Camyre expected a smaller share of the profit than Whitman. Whitman points to no evidence that suggests a non-leadership role, other than his age relative to that of his co- conspirators. The judge who presided at trial and at sentencing is in the best position to make this factual -44- 44 finding. Our review of the record finds significant support for the judge's finding, and there is certainly no clear error. IV. IV. ___ CONCLUSION CONCLUSION __________ For the foregoing reasons, the judgments and the sentences are affirmed. affirmed ________ -45- 45